EDWARD P. MUHA v. UNITED OIL COMPANY, INC.

DANIEL LABELLA v. UNITED OIL COMPANY, INC.

LOISELLE, BOGDANSKI, PETERS, HEALEY and PARSKEY, Js.

Argued December 7, 1979—decision released May 27, 1980

*Richard W. Farrell,* for the appellants (plaintiff in each case).

*Isadore M. Mackler,* with whom, on the brief, was *Leo Gold,* for the appellees (defendant in each case).

ARTHUR H. HEALEY, J. The single question presented by this appeal is whether the defendant, United Oil Company (hereinafter United), was, at the time it terminated two month-to-month leases it had entered into with the plaintiffs for property operated as automobile service stations, a franchisor as defined in General Statutes § 42-133e (b) and (c) (Rev. to 1975). If the defendant was a franchisor, it was obliged to comply with various other provisions set out in General Statutes § 42-133f (Rev. to 1975) relating to the length of the lease term, the grounds for termination, notice of termination and compensation for a franchisee's inventory upon termination.

A brief summary of some of the facts found by the trial court is set out here.[1] Other facts found by the court will be discussed where appropriate. United is the owner of service stations in Connecticut, two of which are leased to the plaintiffs. United is a wholesaler, distributor and "jobber" of gasoline and related petroleum products, which it purchases from Cities Service Oil Company (CITGO) pursuant to a supply contract. United purchases gasoline at a terminal in New York and delivers it in its own trucks to its retail customers in Connecticut. Of the twenty-five stations United supplies in Connecticut, thirteen are owned by United and leased to operating dealers, nine are owned by dealers or others, and three are owned and operated by United. Since March, 1971, United has been a party to contracts with CITGO for the sale of petroleum products produced by it. These contracts did not preclude United from selling other

[1] The plaintiffs have made a substantial attack upon the trial court's finding. We have carefully examined every paragraph sought to be stricken from the finding on the ground that it was found without evidence or in language of doubtful meaning, and every paragraph sought to be added to the finding on the ground that it contains facts that were admitted or undisputed. See Practice Book, 1978, § 3034 (2) (repealed July 1, 1979). Those claims of error directed to the finding not briefed by the plaintiffs are deemed abandoned. *Gigliotti* v. *Wood,* 175 Conn. 243, 247, 397 A.2d 1342 (1978); Maltbie, Conn. App. Proc. § 327. Some of the corrections sought would be immaterial to the result; Practice Book, 1978, § 3039 (repealed July 1, 1979); *Xerox Corporation* v. *Board of Tax Review,* 175 Conn. 301, 304, 397 A.2d 1367 (1978); some relate to draft findings that already appear in the finding in different language or are implicit in the finding; *E & F Realty Co.* v. *Commissioner of Transportation,* 173 Conn. 247, 249, 377 A.2d 302 (1977); *Perley* v. *Glastonbury Bank & Trust Co.,* 170 Conn. 691, 695n., 368 A.2d 149 (1976); and others are clearly unwarranted. The correction we do make is noted in the recitation of facts in the body of the opinion.

brands of petroleum products nor limit the territory within which United could distribute CITGO products.

The plaintiffs, Muha and LaBella, in 1972 and 1973, respectively, entered into one-year leases and one-year sales and equipment agreements with United, which contained annual renewal clauses. These agreements remained in effect until June, 1974, when United exercised its right to terminate the leases and sales and equipment agreements and notified the plaintiffs that, effective September 1, 1974, they would have a month-to-month lease upon the same terms as those contained in the prior leases and that the sales and equipment agreements would likewise be periodically renewed.

The agreements between United and each of the plaintiffs required the plaintiffs to use the tanks, pumps and petroleum storage and dispensing equipment at the two service stations exclusively for sale of gasoline and lubricating oil in agreed upon quantities supplied by United. The agreements did not require the plaintiffs to purchase one particular brand of petroleum products, but only to purchase the brand of products supplied by United. No restrictions were imposed by United upon the plaintiffs with respect to the purchase of products other than gasoline and lubricating oil, and the plaintiffs do in fact purchase tires, batteries, repair parts and other automobile accessories from suppliers other than United. The plaintiffs do a substantial volume of business in the repair and servicing of motor vehicles and the sale of automotive accessories, and derive most of their profit from repairing and servicing automobiles rather than from the sale of gasoline. The leases involved require the plaintiffs to

keep the premises clean and orderly and place upon the plaintiffs certain maintenance functions. Both leases contain the following language: "None of the provisions of this lease shall be construed as reserving to Lessor any right to exercise any control over the business or operations of Lessee conducted upon the Station premises or to direct in any respect the manner in which any such business and operations shall be conducted, subject only to Lessee's performance of the obligations of this lease. Lessee is an independent businessman and neither Lessee nor any party or parties employed by Lessee are agents, servants or employees of Lessor . . . ."

The plaintiffs, Muha and LaBella, in July and August of 1975, respectively, were notified by United that the month-to-month leases and the sales and equipment agreements would terminate effective September 30, 1975. The plaintiffs claimed that these terminations violated General Statutes § 42-133f (Rev. to 1975) and brought the present action seeking to enforce the provisions of § 42-133f. The trial court concluded that United was not a franchisor under § 42-133e (b) and (c) and denied the relief sought.

General Statutes § 42-133e (c) read, at the time the month-to-month leases involved were renewed and later terminated, as follows: " 'Franchisor' means a person who grants a franchise to another person." General Statutes § 42-133e (b) (Rev. to 1975) read: " 'Franchise' means an oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in sub-

stantial part by a franchisor, provided nothing contained herein shall be deemed to create a franchisor-franchisee relationship between the grantor and grantee of a lease, license or concession to sell goods or services upon or appurtenant to the premises of the grantor, which premises are occupied by the grantor primarily for its own independent merchandising activities; and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate."

On appeal the plaintiffs claim that the trial court erred by failing to conclude from the facts found that (1) United prescribed in substantial part a marketing plan or system for the selling of goods and services; and (2) the plaintiffs' business pursuant to such a plan or system was substantially associated with a trademark of United. We conclude that the court did not err in the judgment rendered. Because we conclude that the trial court properly decided that the plaintiffs' business was not "substantially associated" with a trademark of United, one of two requirements under the statute, we need not determine whether the trial court was correct in its conclusion that the plaintiffs did not sell petroleum products pursuant to a marketing plan or system prescribed in substantial part by United.

It is clear that the trial court properly concluded that the operation of the plaintiffs' businesses was not "substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor its affiliate." The trial court con-

cluded that United had no trademark or other brand name or symbol. Instead, United has a limited contract right to utilize the CITGO trademark so long as United distributes petroleum products produced by CITGO. The CITGO trademark remains at all times, however, the property of CITGO. Pursuant to that contract right, United installed and maintained CITGO signs that are owned by CITGO at various locations in both service stations. Except for certain batteries bearing the CITGO trademark,[2] none of the automotive parts or accessories sold or installed by the plaintiffs bears the CITGO trademark. As noted above, the leases and the sales and equipment agreements do not require the plaintiffs to sell only CITGO petroleum products. Therefore, even if United had a trademark and prescribed in substantial part a marketing plan, the plaintiffs' activities were not "substantially related with the franchisor's trademark." General Statutes § 42-133e (b) (Rev. to 1975).

The trial court's decision in this respect also is supported by the fact that United owns no trademark. Under § 42-133e (b) (Rev. to 1975), the plaintiffs' retailing operations had to be "substantially associated with the *franchisor's* trademark." While United utilized CITGO's trademark pursuant to its contract right; see General Statutes § 35-11a (a) ; that trademark never became the property of United. Nor did the plaintiffs demonstrate that any other "commercial symbol designating the franchisor or its affiliate" was employed by United and related to some marketing plan. Although the plaintiffs argue that United is an affiliate of CITGO,

---

[2] This fact has been added to the finding as admitted and undisputed.

a proposition not supported in fact,[3] it is clear that the statute required the commercial symbol to designate the franchisor or its affiliate. If the plaintiffs argue that United is their franchisor, then the trademark would have to designate its affiliate, or CITGO. This proposition is also without support in fact.

The plaintiffs claim that the trial court's interpretation of § 42-133e (b) and (c) (Rev. to 1975) so as to exclude the defendant, as a jobber or distributor, from the definition of "franchisor" is contrary to the legislature's intention in originally enacting those sections. They premise this argument, in large part, on the later amendment of both of these sections. In 1975, the legislature amended § 42-133e (b) by adding to the end of that subsection defining "franchise" the following: "and includes any agreement between a manufacturer, refiner or producer and a distributor, wholesaler or jobber, between a manufacturer, refiner or producer and a retailer, or between a distributor, wholesaler, or jobber and a retailer." Public Acts 1975, No. 75-560 § 1 (effective October 1, 1975). The legislature also altered the definition of "franchisor" in § 42-133e (c) to read: " 'Franchisor' means a person who grants a franchise to another person, including a manufacturer, refiner or producer or a distributor, wholesaler or jobber who grants to a distributor, wholesaler or jobber or retailer, as the case may be, the authority to use a trade-

---

[3] "Affiliate" has been defined as a branch or unit of a larger organization; a company effectively controlled by another or associated with others under common ownership or control. Webster, Third New International Dictionary. The trial court found that United is a privately owned corporation in which CITGO has no financial interest.

mark, tradename, service mark or other identifying symbol or name under a franchise." Ibid.[4] It is clear from these 1975 amendments that the requirements of § 42-133f now apply to distributors and jobbers, such as the defendant.

The plaintiffs' reason, however, that these amendments were intended only to clarify the original definitions, and have referred to authority for the proposition that a subsequent amendment which in effect construes and clarifies a prior statute must be accepted as a declaration of the meaning of the original act. See, e.g., *F.H.A.* v. *The Darlington, Inc.*, 358 U.S. 84, 90, 79 S. Ct. 141, 3 L. Ed. 2d 132 (1958); see also *Tax Commissioner* v. *Estate of Bissell*, 173 Conn. 232, 246, 377 A.2d 305 (1977). In urging this interpretation they state that, although the effective date of the 1975 amendments was October 1, 1975, they are not arguing for any retrospective application of the amendments. The plaintiffs also argue that the purpose behind the enactment of the original franchise act; see Public Acts 1972, No. 287; was to correct abuses in franchise relationships, particularly in the petroleum industry, and that its provisions are therefore remedial in nature and should be liberally construed in favor of the class sought to be benefited. See *Hartford Fire Ins. Co.* v. *Brown*, 164 Conn. 497, 503, 325 A.2d 228 (1973).

While we do not dispute the general principles of statutory construction referred to by the plaintiff,

---

[4] In Public Acts 1975, No. 75-560 § 1, the legislature also altered the definition of "franchisee" in § 42-133e (d) to read: " 'Franchisee' means a person to whom a franchise is granted, including a distributor, wholesaler or jobber or retailer who is granted the authority under a franchise to use a trademark, tradename, service mark or other identifying symbol or name."

we conclude that, when applied with other tenets of statutory construction to the cases before us, they do not require a different result than that reached by the trial court. We do not view the amendments contained in Public Acts 1975, No. 560 merely as clarifying or interpreting the scope of the definitions in § 42-133e (b) and (c) as originally enacted. The language added to the definition of a "franchise" clearly sets forth a new category of agreements, which includes agreements between distributors, wholesalers, or jobbers and retailers. General Statutes § 42-133e (b). The definition of "franchisor" was also expanded so as to include, among other things, a distributor, wholesaler or jobber who grants to a retailer the authority to use a trademark, and contains no requirement that the trademark be that of the franchisor. General Statutes § 42-133e (c). These changes are substantive. They affect substantive rights. Although the plaintiffs state that they do not urge retrospective application of the amendments, the legal and practical effect of their arguments would be just that. Because the amendments enacted in 1975 affect substantive rights, they will be given prospective application only. See *East Village Associates, Inc.* v. *Monroe,* 173 Conn. 328, 331–33, 377 A.2d 1092 (1977); *Massa* v. *Nastri,* 125 Conn. 144, 146–47, 3 A.2d 839 (1939); see General Statutes § 55-3. Rather than being a clarification of the original act, the 1975 amendments appear to have been prompted by the legislative concerns that manufacturers or refiners of petroleum products might utilize distributors, jobbers or middlemen, who were not cov-

ered by the act, to preclude their own character-
ization as franchisors, and, hence, to avoid the
requirements of the original franchise act.[5]

While it is true that the original franchise act
was remedial in nature, and that the legislature, if
it had been requested to do so, may well have
altered the definition of franchisors in that act to
include wholesalers, distributors or jobbers, the
courts are not empowered in such a situation to
alter the meaning of clear language employed by
the legislature. We must interpret statutes as they
are written. See *Rosnick* v. *Aetna Casualty &
Surety Co.*, 172 Conn. 416, 422, 374 A.2d 1076
(1977); *Liistro* v. *Robinson*, 170 Conn. 116, 129,
365 A.2d 109 (1976); *Mancinone* v. *Warden*, 162
Conn. 430, 439, 294 A.2d 564 (1972). It has often
been said that the legislative intent is to be found
not in what the legislature meant to say, but in the
meaning of what it did say. *Wiegand* v. *Heffernan*,
170 Conn. 567, 581, 368 A.2d 103 (1976); *Colli* v.
*Real Estate Commission*, 169 Conn. 445, 452, 364
A.2d 167 (1975); *Sillman* v. *Sillman*, 168 Conn. 144,
148, 358 A.2d 150 (1975). Where the language used
by the legislature is plain and unambiguous, there
is no room for construction by the courts and the
statute will be applied as its words direct. *Baston*

---

[5] Representative Raymond C. Ferrari made the following remarks
on the purpose of the bill containing the 1975 amendments: "The
purpose of the Bill is to correct a loophole in the current law. . . .
[W]hat the Bill does is it changes the definition of franchise to
include the circumstance in which the manufacturer or refiner of
a petroleum product sells to the retailer, through a jobber or through
a distributor and it's to put this within the coverage of the law so
that we don't have the situation where manufacturers or producers
or refiners of petroleum products are getting around the law by
dealing through a jobber, distributor or other intermediary agents."
18 H. R. Proc., Pt. 10, 1975 Sess., pp. 4761–62; see also Joint Stand-
ing Committee Hearings, General Law, Pt. 4, 1975 Sess., pp. 1433–34.

v. *Ricci,* 174 Conn. 522, 528, 391 A.2d 161 (1978); *Johnson* v. *Personnel Appeal Board,* 174 Conn. 519, 521–22, 391 A.2d 168 (1978); *Clark* v. *Mulcahy,* 162 Conn. 332, 338, 294 A.2d 504 (1972). This the trial court did.

There is no error.

In this opinion the other judges concurred.