**GRAND LIGHT & SUPPLY CO., INC.,
Plaintiff-Appellee Cross-Appellant,**

v.

**HONEYWELL, INC., Micro Switch,
Defendants-Appellants
Cross-Appellees.**

**Nos. 995, 997, Docket 84–7868, 84–7900.**

United States Court of Appeals,
Second Circuit.

Argued April 15, 1985.
Decided Sept. 10, 1985.

Lawrence W. Iannotti, New Haven, Conn. (Ronald J. Cohen, Tyler Cooper & Alcorn, New Haven, Conn., of counsel), for defendants-appellants cross-appellees.

Dennis N. Garvey, New Haven, Conn. (Barbara L. Cox, Garvey & Walsh, New Haven, Conn., of counsel), for plaintiff-appellee cross-appellant.

Before OAKES, MESKILL and PIERCE, Circuit Judges.

MESKILL, Circuit Judge:

This appeal and cross-appeal present a number of questions arising out of the termination of a distributorship arrangement between a manufacturer and one of its authorized distributors. The United States District Court for the District of Connecticut, Brieant, J., of the Southern District of New York, sitting by designation, held that defendant's termination of its distributorship with plaintiff violated the Connecticut Franchise Act, Conn.Gen. Stat. § 42–133e *et seq.* (1985) (Franchise Act), and the Connecticut Unfair Trade Practices Act, Conn.Gen.Stat. § 42–110a *et seq.* (1985) (CUTPA). The court also concluded that the termination breached the parties' contract. The award included damages of $116,692.55, punitive damages of $25,000 and attorney's fees. Plaintiff's allegations of antitrust violations were rejected.

We reverse that portion of the judgment holding that the relationship between the parties was a franchise and we therefore reject the court's conclusion that damages may be awarded for a violation of Connecti-

cut's Franchise Act. We also reverse the court's conclusion that defendant breached the distributorship contract. The portion of the judgment holding that defendants' action violated CUTPA is vacated; the cause is remanded for a new trial on the CUTPA issues. Finally, the district court's conclusion that no antitrust violation was proved is affirmed.

## BACKGROUND

Plaintiff Grand Light & Supply Co., Inc. (Grand Light) is a Connecticut corporation doing business in New Haven. As an independent, multi-line distributor of electrical equipment and supplies, plaintiff sells the products of some 250 manufacturers on both a retail and a wholesale basis. Defendant Micro Switch is an unincorporated division of defendant Honeywell, Inc.; both defendants do business in Freeport, Illinois. Honeywell is incorporated in Delaware.

Micro Switch manufactures a wide variety of electrical switches. Its "core" line, J.App. at 664, including basic subminiature and miniature switches, is well established in the national marketplace. Its more recently developed "venture" line, *id.*, consists of such products as photo-electric and proximity devices, oil-tight pushbuttons and limit switches and relays.

Grand Light, which first served as an authorized distributor for Micro Switch in or around 1947, was in the late 1970s one of six such distributors in Connecticut. During much of this time plaintiff was an authorized distributor for approximately 150 manufacturers. Among the other suppliers was Allen-Bradley Corporation, a Micro Switch competitor in certain venture line products.

Plaintiff's relationship with Micro Switch, apparently informal in earlier years, became subject to guidelines in 1975 when the "Authorized Distributor Performance Expectations" guide was issued by Micro Switch. J.App. at 134. This guide attempted to delineate manufacturer and distributor responsibilities and discussed selection and termination of distributors; it

did not, however, specify any grounds for termination.

In 1977 Micro Switch issued the "Micro Switch Authorized Distributor Policy," J.App. at 144; this policy was in force in 1978 when Grand Light was terminated. Here, for the first time, Micro Switch stated, "[t]ermination may be made by either party with 30 days written notice." *Id.* at 147.

Grand Light began to perceive problems in its relationship with Micro Switch in early 1975. A Grand Light officer was then told by a Micro Switch official that performance expectations were being increased and that other distributors were being terminated because of inadequate sales and promotional efforts. Plaintiff was urged to increase its efforts to sell the new venture line products. Grand Light agreed to continue stressing the core line and was enthusiastic about the new photoelectric products, but, believing that the Allen-Bradley Corp.'s line of pushbuttons, limit switches and relays was superior, it was reluctant to stock Micro Switch's competing lines of those products.

In 1976 Micro Switch personnel expanded the schedule of joint sales calls and Grand Light hired a salesman to work exclusively with Micro Switch products. As a result, Grand Light's Micro Switch sales doubled. However, in 1977 Micro Switch informed Grand Light that it would not continue these special sales efforts. Grand Light was also told that its sales figures were below projections. In 1977 and early 1978 Grand Light and Micro Switch personnel met to discuss the situation; the subject of termination was apparently raised at one or more of these meetings.

In June 1978 Grand Light received a letter from Richard Rudig, Branch Sales Manager, stating that Rudig planned to recommend termination of Micro Switch's arrangement with Grand Light. J.App. at 129–30. Rudig cited as reasons for his decision, the absence of sales increases in 1977 and 1978 and Grand Light's failure to involve Micro Switch in "sales opportunities."

This termination recommendation was approved by the Regional Sales Manager, Alex Garner, who offered to meet with Grand Light to discuss the pending termination. After a meeting, Garner wrote another letter to Grand Light summarizing the contents of the meeting. J.App. at 132. Garner stated that the reasons for termination were "a lack of sales growth and a lack of aggressive support of Micro Switch by Grand Light." *Id.* Garner suggested that Grand Light submit a distributorship application as if no prior relationship had existed. Grand Light complied, submitting a lengthy letter outlining its qualifications for the distributorship. Micro Switch officials considered the matter and determined that termination was the proper course. In a letter dated August 25, 1978, Micro Switch informed Grand Light that the termination would become effective on September 27, 1978. *Id.* at 133.

Grand Light filed suit in Connecticut state court in September 1978, seeking an injunction preventing Micro Switch from terminating its contract with Grand Light. Plaintiff asserted that Micro Switch's actions violated the Franchise Act and constituted a tortious interference with business relations and a breach of contract. The state court granted a temporary injunction and scheduled a hearing. Defendants then removed the action to federal court on the ground of diversity of citizenship and plaintiff amended its complaint to include federal and state antitrust claims and an allegation that defendants' use of plaintiff's customer lists constituted an unfair trade practice.

Plaintiff's request for a preliminary injunction was denied because plaintiff failed to show irreparable harm. *See Grand Light & Supply Co. v. Honeywell, Inc.,* 80 F.R.D. 699 (D.Conn.1978). A bench trial occurred in July 1983 and the parties filed post-trial briefs in February 1984. In a lengthy opinion, the court held that the arrangement between the parties constituted a franchise under the Franchise Act, that defendants' termination of plaintiff violated that Act because it was not based on

good cause, that defendants acted in bad faith and that the termination constituted a violation of CUTPA because of that bad faith. The court also concluded that defendants breached the contract, both because the sixty day limitations period of the Franchise Act overrode the contract's thirty day term and because defendants' bad faith violated the implied good faith provision read into the contract from Connecticut's Uniform Commercial Code, Conn.Gen. Stat. § 42a–1–203 (West Supp.1985).

The court rejected plaintiff's federal and state antitrust claims, holding that the tying claim failed because plaintiff had failed to present evidence of coercion forcing plaintiff to purchase the venture line products. Because plaintiff was eager to sell the photo-electric products, the court concluded that the requisite coercion was absent. Moreover, the court determined that no anticompetitive effects in the market for the tied products had been shown. Plaintiff's allegations of attempted monopolization were also rejected. The court held that plaintiff had not presented evidence sufficient to demonstrate that defendant had used its market power in the basic line to gain a competitive advantage in the venture line. Finally, the court rejected plaintiff's allegations that defendants had tortiously interfered with plaintiff's business relationships. The court held that plaintiff had failed to demonstrate that defendants acted for an improper purpose and had failed to show actual financial loss or deprivation of business opportunities.

The court awarded damages in the amount of $116,692.55, representing plaintiff's average gross profits from the distributorship for five years, $25,000 in punitive damages under CUTPA and attorney's fees. The court declined to issue a permanent injunction. This appeal followed.

### DISCUSSION

#### Connecticut Franchise Act

Defendants assert first that the district court erred in holding that the Franchise Act applies to the relationship between Grand Light and Micro Switch. Second, defendants argue that even if this relationship is a franchise, plaintiff was terminated for good cause. Because we agree with defendants' first contention, we need not reach the second.

According to the material portion of the Act,

(b) Franchise means an oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor ...; and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate....

Conn.Gen.Stat. § 42–133e(b).

The district court held that the Authorized Distributor Policy constituted a "marketing plan or system" prescribed in substantial part by Micro Switch and that Grand Light's business in Micro Switch products was "substantially associated" with the Micro Switch trademark. J.App. at 67, 70. We concede that the statutory language is ambiguous. On one hand, the fact that a franchisee has the right to *"engage in the business "* (emphasis added) of distributing the franchisor's goods suggests that the statute contemplates a relationship in which the franchisee's business consists primarily of such distribution. On the other hand, the requirement that "the operation of the franchisee's business pursuant to such plan or system" be associated with the franchisor's trademark, if interpreted in its most literal sense, could mean that only that portion of the franchisee's business that is conducted pursuant to the marketing plan need be associated with the franchisor's trademark. Of course, that same clause could also be construed to require that the operation of the franchisee's entire business must be substan-

tially associated with the franchisor's trademark.

■ Observing that the plain language of the Act included no exclusive dealing requirement, the district court concluded that the instant arrangement constituted a franchise even though Micro Switch products represented less than three percent of Grand Light's sales. J.App. at 60–61. We do not agree with this conclusion. While we acknowledge that one literal interpretation supports the district court's position, we hold that plaintiff is not a franchisee within the contemplation of the Act. Where such a literal interpretation of the statute's language would lead to absurd results, we may adopt an alternate construction. *Commissioner v. Brown*, 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965). In view of the purpose of the statute, it seems wrong to suggest that a distribution relationship involving only a minute percentage of business creates a franchise under Connecticut law.

The Franchise Act was passed for the purpose of correcting abuses in relationships between franchisees and franchisors. *Muha v. United Oil Co.*, 180 Conn. 720, 728, 433 A.2d 1009, 1013 (1980). One commentator noted that an inherent aspect of franchise relationships was the economic disparity of the parties: "Were it not for this disparity, why would the franchisee have sought out the assistance of such a franchisor? The recognition of this fact and the economic realities of the franchise relationship have given fairly recent rise to legislative attempts to remedy historic abuses within the franchise field." Farrell, *Franchising in Connecticut—"Can Anybody Here Play This Game?"* 54 *Conn. B.J.* 446, 447 (1980). *See also Carlos v. Philips Business Systems*, 556 F.Supp. 769, 775–76 (E.D.N.Y.) (interpreting Connecticut act and "virtually identical" New Jersey act; noting that the latter was intended to correct for unequal bargaining power in franchise relationships), *aff'd mem.*, 742 F.2d 1432 (2d Cir.1983).

Thus it is clear that the purpose of the statute was to prevent a franchisor from taking unfair advantage of the relative economic weakness of the franchisee. In light of such a purpose, it is apparent that the Act was not intended to cover a relationship such as the one at issue. In the ordinary franchise situation, typically involving an exclusive relationship, termination by the franchisor could result in economic disaster for the franchisee. Where the franchisee is completely dependent on the public's confidence in the franchised product for most or all of his business, abrupt severance of the franchise tie, without good cause and without sufficient notice, could spell ruination. No such dependence existed here. Grand Light derived a scant three percent of its business from Micro Switch products. Termination, although harmful from Grand Light's point of view, was not catastrophic.

■ If the Franchise Act were interpreted to apply to situations such as the one at bar, the legislative cure would be worse than the illness. Rather than protecting small business operators from capricious destruction of their livelihoods, the Act would unjustifiably interfere with the normal functioning of the marketplace. Application of the Act to situations such as this one, if extended to its logical conclusion, would lock into the Act's provisions every manufacturer that wished to offer promotional guidance or materials. The societal costs of this interference with normal business relationships would constitute legislative overkill. Where the result of a literal interpretation of statutory language is absurd, *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981), or where the obvious purpose of the statute is thwarted by such slavish adherence to its terms, *Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978), we may look beyond the plain language. We conclude that the instant business relationship is not a franchise within the meaning of the Act.

Apparently the state courts have considered the Act only twice; *see Muha v. United Oil Co.*, 180 Conn. 720, 433 A.2d

1009 (1980), and *Consumers Petroleum of Connecticut, Inc. v. Duhan,* 38 Conn.Supp. 495, 452 A.2d 123 (Conn.Super.Ct.1982); both interpretations support our conclusion. Although the district court found these cases distinguishable, we do not share that view. Thus, we are bound by Connecticut's state court constructions of its laws. *Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 65, 101 S.Ct. 2176, 2180, 68 L.Ed.2d 671 (1981); *Sanchez v. United States,* 696 F.2d 213, 216 (2d Cir.1982); *Gentry v. MacDougall,* 685 F.2d 322, 323 (9th Cir.1982); *Perrin v. Pearlstein,* 314 F.2d 863, 866 (2d Cir.1963). This is so even where the only available interpretation is that of an intermediate court, "unless we find persuasive evidence that the highest state court would reach a different conclusion." *Entron, Inc. v. Affiliated FM Insurance Co.,* 749 F.2d 127, 132 (2d Cir. 1984). No such evidence exists here; in fact, the opposite is true.

The only state court decision directly on point is *Consumers Petroleum,* a decision of the appellate session of the superior court. In *Consumers Petroleum,* the court considered a gasoline distributorship and held that no franchise relationship existed. Among the factors the court examined were the lessor's control of hours and days of operation, placement of advertising signs and equipment loans. Concluding that these factors were not sufficient to create a franchise relationship, the court noted that additional evidence of control by the lessor would increase the likelihood of a finding that a franchise existed. 38 Conn. Supp. at 498, 452 A.2d at 125. Among the possible indicia of control noted by the court were the franchisor's auditing of books and inspection of premises, control of lighting, employee uniforms, prices, trading stamps and hiring, establishing of sales quotas and management training and financial support. *Id.* at 498–99, 452 A.2d at 125.

The state court found the absence of these additional factors significant in *Consumers Petroleum.* We find their absence similarly significant here. Despite the district court's conclusion that the factors

enumerated apply only to retail situations, we are not convinced that a franchise relationship can exist in the absence of all external manifestations. The district court relied on the fact that Micro Switch products were labeled with the manufacturer's name while other products were sold generically and on Grand Light's use of shipping labels and promotional devices with Micro Switch trademarks. J.App. at 70–71. We find neither factor to be persuasive.

Although Connecticut's highest state court has considered the Act only once, we believe that it would agree with the conclusion we reach here. In *Muha,* the court held that no franchise relationship existed because the defendant lessor owned no trademark. 180 Conn. at 726–27, 433 A.2d at 1011–12. However, the court suggested that the absence of exclusivity in the lessor/lessee relationship would have been significant even if there had been a trademark: "[T]he leases and the sales and equipment agreements do not require the plaintiffs to sell only CITGO petroleum products. Therefore, even if [defendant] had a trademark and prescribed in substantial part a marketing plan, the plaintiffs' activities were not 'substantially related [sic] with the franchisor's trademark.'" *Id.* at 726, 433 A.2d at 1012 (quoting Conn. Gen.Stat. § 42–133e(b)). Although this statement is dictum, we take it as a clear indication that while the state's highest court might not require that the entire business be associated with the franchisor's trademark, it would at least insist that more than three percent of the franchisee's business be involved.

Therefore, we hold that the district court erred in concluding that the Connecticut Franchise Act governed the relationship between Micro Switch and Grand Light. Because that arrangement did not fall within the statutory definition of a franchise, the Act does not apply. Thus, the court's conclusion that Micro Switch's termination of Grand Light violated the Act's provisions is erroneous. Consequently, the thirty day termination provision in the agreement ap-

plies. That Micro Switch complied with that provision is not in dispute.

The district court also held, however, that the good faith obligation found in the Uniform Commercial Code, Conn.Gen.Stat. § 42a–1–203, was an implied provision of the contract and that Micro Switch, by acting in bad faith, breached that provision. We do not believe that the U.C.C. requirement abrogates the effect of the contractual terms.

 Under Connecticut law, the parties may rely on the express terms of their contract. *Zullo v. Smith*, 179 Conn. 596, 601, 427 A.2d 409, 412 (1980). The U.C.C. good faith provision may not be used to override explicit contractual terms. *Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129, 138 (5th Cir.), *cert. denied*, 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979). *See also Triangle Mining Co. v. Stauffer Chemical Co.*, 753 F.2d 734, 740 (9th Cir.1985) (absent special reliance or unequal bargaining power, clear termination provision renders motive behind termination irrelevant); *Cardinal Stone Co. v. Rival Manufacturing Co.*, 669 F.2d 395, 396 (6th Cir.1982) (contract was negotiated by experienced businessmen; court refuses to apply U.C.C. good faith requirement to override express termination provision). Because the record reveals no reason for ignoring the contract's terms, we hold that where the contract expressly provides for termination on thirty days notice, no good faith requirement should be implied to override the contractual provisions. Therefore, the termination was proper within the terms of the contract.

## CUTPA

Next we must consider the district court's conclusion that Micro Switch violated CUTPA. The court stated that Grand Light's amended complaint had alleged only that Micro Switch's " 'acts and conduct … with respect to plaintiff's customer lists constituted an unfair trade prac-

tice.' " J.App. at 91. The court also acknowledged, however, that plaintiff had been permitted to "expand" its claim. Plaintiff asserted in its post-trial brief that the customer list allegation stated a claim under CUTPA and argued that defendants' "tying arrangement, … interference with plaintiff's business and contractual relations" and bad faith termination also violated CUTPA. J.App. at 91.

The district court rejected Grand Light's customer list claim, holding that the allegation failed to state a CUTPA claim. However, the court did "find and conclude that defendant[s'] bad faith termination of Grand Light's authorized distributorship states a claim under CUTPA, to the extent that price cutting activities of Grand Light … were a part of the motivation." J.App. at 92.

Micro Switch contends on appeal that the district court erred in allowing plaintiff to submit a new unfair trade practice claim after the conclusion of the trial and in holding that the termination of Grand Light violated CUTPA. Grand Light argues that Micro Switch had sufficient notice of the new claim and contends that the district court's conclusion that defendant violated CUTPA should be affirmed.

The material portion of CUTPA states: (a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

. . . .

(d) It is the intention of the legislature that this chapter be remedial and be so construed.

Conn.Gen.Stat. § 42–110b.

 Thus, a plaintiff attempting to prove a violation of CUTPA must show that defendant engaged in either "unfair methods of competition [or] unfair or deceptive acts or practices." Conn.Gen.Stat. § 42–110b; *see also McLaughlin Ford, Inc. v. Ford Motor Co.*, 192 Conn. 558, 567, 473 A.2d 1185, 1190 (1984).[1] We need not

---

1. The district court indicated that CUTPA also required that plaintiff prove a public interest

nexus, concluding that such a connection existed here because of the violation of the Fran-

address the merits of plaintiff's CUTPA claim because we agree with defendants that the district court erred in ruling in plaintiff's favor on a claim that was first raised in a post-trial brief.

■ Under Fed.R.Civ.P. 15(b), the district court may allow a party to amend its pleadings to conform to the evidence.[2] Such a motion rests in the sound discretion of the trial court, *Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078, 1086 (2d Cir.1977), and may be reversed only if we conclude that the court abused its discretion. *Hardin v. Manitowoc-Forsythe Corp.*, 691 F.2d 449, 457 (10th Cir.1982); *Gonzales v. United States*, 589 F.2d 465, 469–70 (9th Cir.1979).

"The purpose of Rule 15(b) is to allow the pleadings to conform to issues actually tried, not to extend the pleadings to introduce issues inferentially suggested by incidental evidence in the record." *Browning*, 560 F.2d at 1086. Where a party seeks to apply evidence presented on a separate issue already in the case to a new claim added after conclusion of the trial, the opponent may be unfairly prejudiced. *Cook v. City of Price*, 566 F.2d 699, 702 (10th Cir.1977); *see Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330–31, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971). Substantial prejudice may exist where it is not clear that the opposing party had the opportunity to defend against the new claim and where that party might have offered additional evidence had it known of the claim. *Hardin*, 691 F.2d at 456; *Inter-*

*national Harvester Credit Corp. v. East Coast Truck*, 547 F.2d 888, 890 (5th Cir. 1977).

■ Here, the district court found a CUTPA violation based on its conclusion that defendants' termination of plaintiff was not done for good cause under the Franchise Act. That Act defines good cause as including, but not "limited to the franchisee's refusal or failure to comply substantially with any material and reasonable obligation of the franchise agreement." Conn.Gen.Stat. § 42–133f(a). Thus, the court's determination that Micro Switch had committed unfair trade practices was premised on evidence submitted by the parties for the purpose of addressing the question of whether Grand Light had failed to comply with the alleged franchise agreement. It is clear to us that a violation of the Franchise Act would not necessarily implicate the interests protected by CUTPA. Hence, the evidence that Micro Switch presented to challenge the Franchise Act claims might have differed significantly, both in kind and in scope, from that which it would have used to counter the more general CUTPA claims. The fact that some CUTPA claims find some incidental support in the record does not suffice to justify the court's ruling based on plaintiff's post-trial theories of liability. *Hardin*, 691 F.2d at 457.

We hold that the district court abused its discretion in permitting plaintiff to amend its complaint after trial without allowing defendants the opportunity to present addi-

---

chise Act. J.App. at 94. The Connecticut legislature recently amended CUTPA to clarify that the statute requires no proof of public interest or public injury. 1984 Conn.Acts No. 468, § 2(a) (Reg.Sess.). This amendment was approved on June 8, 1984, one month before the district court opinion was issued, and took effect at the time of passage.

**2.** Fed.R.Civ.P. 15(b) states:
(b) AMENDMENTS TO CONFORM TO THE EVIDENCE. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to con-

form to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

tional evidence. The "trial of unpled issues by implied consent is not lightly to be inferred under Rule 15(b)," particularly "in light of the notice demands of procedural due process." *Jimenez v. Tuna Vessel "GRANADA,"* 652 F.2d 415, 422 (5th Cir. 1981). Thus, we remand to the district court for trial on the question of the existence of a CUTPA violation in view of our conclusion that no Franchise Act violation is possible because no franchise relationship exists.[3]

*Antitrust—Monopoly Leveraging Claims*

Finally, we address plaintiff's cross-appeal from the district court's holding that defendants' termination of the arrangement with plaintiff did not violate federal and state antitrust laws. The court held that, even if Micro Switch did have monopoly power in the core line products, plaintiff had failed to prove that Micro Switch used that power to attempt to protect its venture line products. Thus, the court held that no violation of either federal or state antitrust laws had been proved.

We affirm the judgment of the district court. Our review of the record reveals nothing to persuade us that the court erred.

■ A successful claim of monopoly leveraging requires proof of at least three factors: monopoly power in one market, " 'the use of [that] power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor' " in another distinct market, *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 275 (2d Cir.1979) (quoting *United States v. Griffith,* 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948)),

*cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980), and injury caused by the challenged conduct. The district court assumed the existence of the first factor. While we might not agree, we need not consider the issue because the court's conclusion was clearly correct on the second question, which is dispositive.

■ The court found that plaintiff had not sustained its burden of showing that defendants used whatever market power they had to gain a competitive advantage. In the absence of proof of such abuse of market power, defendants' termination of plaintiff and certain other distributors must be viewed as legitimate conduct of a successful business. *See United States v. Aluminum Company of America,* 148 F.2d 416, 430 (2d Cir.1945) (L. Hand, *J.* ). ("The successful competitor, having been urged to compete, must not be turned upon when he wins."); *see also Berkey Photo, Inc.,* 603 F.2d at 276 ("[A] large firm does not violate § 2 [of the Sherman Act] simply by reaping the competitive rewards attributable to its efficient size."). The district court's rejection of plaintiff's monopoly leveraging claim was not clearly erroneous. Thus, we affirm this portion of the judgment.

CONCLUSION

We reverse that portion of the district court's judgment that concluded that Connecticut's Franchise Act applied to the relationship between plaintiff and defendants and hold that the distributorship agreement applied but that no violation of its terms occurred. We vacate that portion of the

---

**3.** Defendant also argues that the district court erred in its calculation of the damage award. Although our remand of the CUTPA claim may make consideration of damages unnecessary, we note here that we see no error in the court's approach.

Damages under CUTPA are to be measured according to a restitution formula rather than according to contract principles. *Bailey Employment System v. Hahn,* 545 F.Supp. 62, 73 (D.Conn.1982). The district court's task was to attempt to return to plaintiff what it lost as a result of defendants' actions. The measure used

by the court was a reasonable means of achieving this goal. Moreover, an award of punitive damages is appropriate under CUTPA if the court believes "that a measure of deterrence is in order." *Id.* Thus, if the court determines on remand that defendants' actions did violate CUTPA, the court may reinstate the damage award. Of course, the court may also modify the award to reflect any changes that become apparent after defendants have had the opportunity to present additional evidence to counter the CUTPA claims.

judgment holding that plaintiff's post-trial brief stated a claim under CUTPA and remand for trial on the issue of the existence of a CUTPA violation. The district court's rejection of plaintiff's cross-appeal is affirmed.