[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action was returned to court on September 17, 1991. It was initiated on August 21, 1991 by application for order to show cause why injunction should not issue and for a temporary injunction.
The court granted an ex parte temporary order for injunction pending a hearing on the case. The temporary order issued on August 21, 1991, reinstated the plaintiff as an Engineered Sound Full Line Contractor (ESC) and restrained the defendant from terminating the plaintiff's status as an Engineered Sound Full Line Contractor until further order of the court.
The matter was continued by agreement of the parties until June 12, 1992 and June 17, 1992 when the court heard the parties and accepted evidence and argument on plaintiff's request for a temporary injunction. The relief sought in the temporary injunction proceeding was:
1. To reinstate the plaintiff as an Engineered Sound Full Line Contractor, and;
2. To restrain the defendant from terminating the plaintiff's status as an Engineered Sound Full Line Contractor until such time as all the issues relevant to the above-captioned CT Page 8636 lawsuit have been litigated.
Plaintiff's status as an Engineered Sound Full Line Contractor was derived from an agreement with the defendant dated December 5, 1988 (Exhibit B). The agreement titled "Contractor Agreement" describes plaintiff as an Engineered System Contractor, (ESC) authorized to sell, install and service the following Bogen products:
01 Engineered Sound Full Line Contractor within the State of Connecticut only.
The agreement was not an exclusive agreement inasmuch as Bogen the defendant reserved the right to determine the number of contractors necessary to achieve proper market coverage. At the time the agreement was executed December 5, 1988, and on the date of the termination letter, July 9, 1991 (Exhibit A), there were three Engineered System Contractors operating in Connecticut: the plaintiff MS Audio, Inc., another entity known as MS Sound, Inc., and Toneklear Sonics.
A termination clause, paragraph five in the agreement, provided this agreement shall be effective on the date hereof and shall continue until terminated by either party by thirty days prior written notice unless sooner terminated as provided hereunder.
By letter dated July 9, 1991 (Exhibit A), the defendant Bogen terminated the agreement effective immediately. The letter stated as follows: "The reason for termination is your continuance of activities which are detrimental to the interest, reputation and goodwill efforts of Bogen Communications, Inc. in our entire franchise structure."
The defendant Bogen is in the business of manufacturing sound and communication products and systems. The items that Bogen designs and manufactures include amplifiers, speakers, microphones, intercom systems and some voice processing products. Bogen markets its products in two different ways, through commercial sound contractors and through Engineered Sound Full Line Contractors (ESC). The plaintiff in this case has a relationship with Bogen both as a commercial sound contractor and as an Engineered Sound Full Line Contractor. Defendant's letter of July 9, 1991, terminating the contractor agreement between the plaintiff and the defendant clearly indicated that the plaintiff remained in good standing with Bogen as a commercial sound contractor with access to its general product line as well as its exclusive D Series Modular Amplifier Line.
The ESC agreement entitles a contractor access to the CT Page 8637 defendant's top line of audio equipment, technology, and marketing as well as pricing incentives. Contractors without the ESC agreement can only purchase the "general" Bogen line of products. The top or ESC line of products includes school intercom communication equipment that an ESC can list and price on municipal school construction competitive bids.
On December 9, 1991, the plaintiff filed an amended complaint in three counts. In the first count the plaintiff complained that the defendant breached a franchise agreement, and as a result of such termination and breach of contract, the plaintiff's business and its reputation will be greatly damaged. In the second count the plaintiff alleged that the action on the part of the defendant in terminating the contract agreement constituted a violation of the Connecticut Unfair Trade Practices Act, C.G.S. 42-110a, et seq.; in the third count the plaintiff claims that the actions on the part of the defendant were a violation of the Connecticut Franchise Act, C.G.S. 42-133e. By way of relief the plaintiff asked to be reinstated as an Engineered Sound Full Line Contractor; that the defendant be restrained by injunction from terminating the plaintiff's status as an Engineered Sound Full Line Contractor; money damages; punitive damages pursuant to C.G.S. 42-110g(a); attorneys fees and costs pursuant to C.G.S. 42-133g.
The contract itself in a section titled "other matters" provides that this agreement is entered into in the State of New Jersey and is to be construed solely in accordance with the laws of the State of New Jersey without giving effect to any provision of choice of laws.
This clause which provides for a choice of law and choice of forum was brought to the attention of the parties at the time of the hearing, but both parties agreed that they would go forward on the issue of the injunction and the determination of whether the Connecticut Franchise Act applied to this agreement. This agreement was consistent with the court's understanding of the law based upon Carlos v. Philips Business Systems. Inc. 742 F.2d 1432 3rd Cir. (1983) to the effect that neither New Jersey's nor Connecticut's Franchise Acts are extraterritorial, and therefore the controlling body of law for the purpose of determining whether or not a franchise relationship exists in this case is the Connecticut Franchise Act. Accordingly, at the hearing, plaintiff's evidence to the court related solely to the third count, the claimed violation of the Connecticut Franchise Act. Defendant joined issue on this count challenging plaintiff's contention that the relationship between the parties enjoyed the protection of the Connecticut Franchise Act.
In its posttrial memorandum, defendant now argues that CT Page 8638 if the court determines that the agreement between the parties was not a franchise that the court should dismiss all of the other counts because of the valid and binding choice of law and choice of forum provisions in the contract. Plaintiff has not had an opportunity to respond to this argument, and therefore the court will not address this contention until it has determined whether or not the plaintiff is entitled to injunctive relief.
Franchise means an oral or written agreement or an arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor . . . and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logo type, advertising or other commercial symbol designating the franchisor. . . . Connecticut General Statutes42-133e(b).
Section 42-133f entitled termination or cancellation of or failure to renew a franchise provides as follows: no franchisor shall directly or through any officer, agent or employee, terminate, cancel or fail to renew a franchise except for good cause which shall include but not be limited to the franchisee's refusal or failure to comply substantially with any material or reasonable obligation of the franchise agreement. . . The franchisor shall give the franchisee written notice of such termination, cancellation or intent not to renew, at least 60 days in advance to such termination, cancellation or failure to renew with the cause stated therein.
The language of the statute has been described as ambiguous, Grand Light Supply Co., Inc. v. Honeywell, Inc.,771 F.2d 672, 676. "On one hand, the fact that the franchisee has the right to engage in the business of distributing the franchisor's goods suggests that the statute contemplates a relationship in which the franchisee's business consists primarily of such distribution. On the other, the requirement that the operation of the franchise business pursuant to such plan or system be associated with the franchisor's trademark if interpreted in its most literal sense could mean that only that portion of the franchise business that is conducted pursuant to the marketing plan need be associated with the franchisor's trademark." Id. p. 576.
The plaintiff in this instance is both a commercial sound contractor and an Engineered Sound Full Line Contractor. Only the latter is claimed to be a franchise, and the former is in no way affected by the subject matter of this action.
CT Page 8639 The purpose of the statute is to prevent a franchisor from taking unfair advantage of the relative economic weakness of the franchisee. In a typical franchise involving an exclusive relationship either as to the territory involved or the distribution of the product where the franchisee is completely dependent on the public's confidence in the franchise product for most or all of his business, abrupt severance of the franchise tie without good cause and without sufficient notice could spell ruination; Id. 677. In this case the plaintiff while admitting that he has other business contends that approximately 80 percent of his business is related directly or indirectly to the distribution of the Engineered Sound Full Line Products, the subject of the contract in question.
The evidence is in a dispute on this particular point as to the extent of the plaintiff's business which is involved with Bogen Products, either the general line or the Engineered Sound Full Line Product.
Fundamentally, the Franchise Act is concerned with the amount of control exercised by the franchisor over the franchisee's business. With regard to indicia of control, there are examples given in various cases which are helpful when the court examine, the written agreement to the relationship between the parties to determine what explicit controls are retained by the franchisor. In considering the matter of operational control, the court must also consider the second portion of the statute which provides that the operation of the franchise business pursuant to such a plan or system is substantially associated with the franchisor's trademark, service mark, tradename, logo type, advertising or other commercial symbol designating the franchisor or its affiliate.
There is no exclusivity provision in the Connecticut act requiring a franchisee to carry only a franchisee's merchandise. However, some portion of the business operated pursuant to the marketing plan must be substantially associated with the franchisor's trademark. In Grand Light Supply Co., Inc. v. Honeywell, Inc., 771 F.2d 672 the 2nd Circuit interpreted dicta in Muha v. United Oil Co., 180 Conn. 720, 726, to mean that the absence of exclusivity in a lessor/lessee relationship would have been significant even if there had been a trademark and went on to state that exclusivity is not required under the act but that more than 3 percent be involved.
In this instance the agreement between the parties (Exh. B) does not restrict the plaintiff from carrying other products, and indeed it has other products available to distribute to the general public. The agreement itself does not refer specifically to the plaintiff as a franchisee nor does it use the word CT Page 8640 franchise. The plaintiff has offered evidence that the defendant has used the term franchise repeatedly throughout the tenure of the relationship between the parties and that such use is indicative of the parties' intent to create a franchise. The plaintiff has offered exhibits in evidence to demonstrate the frequency of the words used throughout the relationship.
At the commencement of the relationship in a letter dated September 7, 1988, David Chambers, vice-president of sales at Bogen, expressed Bogen's desires to establish a "franchise" and encloses two Engineered Sound Franchise Agreements. (Plaintiff's Exh. A). In a letter dated July 9, 1991, (Exhibit E) Thomas G. Parker, Bogen's sales manager, delivered a termination notice under the caption Re Franchise Status which refers to franchise structure.
From time to time during the relationship, Bogen forwarded to the plaintiff confidential franchise price sheets. Plaintiff's Exhibit L and M. Technical notes sent to the plaintiff by the defendant referred to Franchised Engineered Sound Contractor personnel and confidential Franchised Engineered Sound Contractor price sheets (Exhibit L.) Exhibit L specified that Bogen sells its MultiCom 2000 System (MC2K) only to factory franchise Engineered Sound Contractors.
The contract agreement itself (Exhibit B) states this agreement is not an exclusive agreement or territorial assignment. Bogen reserves the right to determine the number of contractors necessary to achieve proper market coverage. Nor does this agreement create a relationship of employer-employee, agency, joint venture or partnership. ESC has no right or authority to bind Bogen nor shall it represent that it has such right or authority. Rather ESC will maintain its status as an independent entity purchasing equipment from Bogen.
Paragraph three of the agreement describes the ESC's responsibilities. ESC will protect and promote the good name of Bogen and avoid any activity which might be detrimental to Bogen's interest, reputation or goodwill. In furtherance of this agreement, the ESC agrees to maintain a competent and properly equipped installation and service department to install and service products within the territory when so requested, maintain a stock of parts that is sufficient for the purpose of installing and servicing the products. The ESC agrees not to sell, install or service products outside the territory without the prior written consent of Bogen. The ESC shall assume full responsibility for the proper design of Bogen's systems sold by it and shall install or supervise the installation of all systems sold by it. ESC agrees to meet the financial requirements established by Bogen for authorized Engineered System Contractors CT Page 8641 from time to time and to provide Bogen's credit department with certified year-end balance sheets and profit and loss statements upon request.
Paragraph four provides that Bogen will nationally advertise the products and make available to ESC advertising material for its use. The amount and frequency of such advertising and material shall be determined by Bogen at its sole discretion. Paragraph five, entitled termination, provides this agreement shall be effective on the date hereof and shall continue until terminated by either party by thirty days' prior written notice unless sooner terminated as permitted hereunder.
Paragraph five further provides that in the event the ESC is in default and observing or performing any of the provisions hereunder, or shall cease conducting its business in the ordinary course or shall file a petition in bankruptcy or if its financial situation is deteriorated to such an extent that there is reason to believe that it is unable to fulfill its obligation under this agreement (which determination shall be made by Bogen in its sole discretion) then Bogen may terminate this agreement effective immediately by giving written notice to ESC. Exhibit A the letter of termination did not refer to any of these reasons when it provided for a letter of immediate termination.
The evidence at the hearing supports plaintiff's contentions that the parties had a harmonious relationship from the inception of the written contractor agreement, December 5, 1988, until Bogen and the three Connecticut Engineered Sound Full Line Contractors reached an oral agreement on June 21, 1990. This agreement came about because one of the contractors, ToneKlear, complained that plaintiff was bidding the Bogen Engineered Sound Line Full products on jobs wherein the owner had adopted bidding specifications submitted by ToneKlear. The termination letter of July 9, 1991 from Bogen came about because plaintiff subsequently bid on two Connecticut jobs on which the specifications had been submitted by ToneKlear. Defendant contends that this action was the basis for a cause termination contemplated by the oral agreement.
The plaintiff contends that he did not violate this agreement because his bid on the job was based upon a competitor's line, and neither the written agreement nor the oral modification forbade him from submitting a bid using a competitor's line. The other incident which provoked the termination letter involved the DiLoretto School in New Britain which had requested competitive bids for its intercom system in early July 1991. The specifications for this job were prepared by ToneKlear. MS Audio the plaintiff submitted a proposal for this job which included Bogen general line equipment only in accordance with plaintiff's CT Page 8642 understanding that this would not be a violation of the oral modification of the written agreement.
The agreement also provided that the ESC shall not assign this agreement or any rights granted hereunder without the prior written consent of Bogen.
As noted the written agreement does not use the term franchise. Absence of the term franchise in agreement between parties is relevant although not determinative of the nonexistence of a franchise for purpose of the Connecticut Franchise Act. McKeown Distributors, Inc. v. Gyp-Crete Corp., 618 F. Sup. 632, at 643 D.C. Connecticut 1985. of greater significance is the absence of any explicit reference to a marketing plan or system prescribed in substantial part by a franchisor. The defendant argues strenuously that the defendant did not prescribe any marketing plan or system in the arrangement between the parties and offered evidence that the defendant had no control over the hours of operation of the plaintiff; that the defendant did not explicitly require the plaintiff to use its trademark in any advertising or post any signs at its place of establishment displaying the defendant's trademark; that the defendant did not perform any auditing of the plaintiff's books, although financial statements were submitted for the purpose of allowing the plaintiff to purchase the defendant's products on open account; that the defendant did not direct the plaintiff how to operate its business; that the defendant did not charge a franchise fee to the plaintiff in connection with the agreement; that the defendant did not control the price at which the plaintiff sold Bogen products to any end user; that the plaintiff could price goods purchased from the defendant at its discretion; that the defendant did not require the plaintiff to sell only its goods; that the plaintiff sold and had access to goods manufactured by competitors of the defendant; that the plaintiff had access to a system directly competitive with Bogen products, the system called Telecor; that there were other competitors of the defendant in the Engineered Sound Full Line business; to wit: Rauland/Dukame and Telecor; that the defendant did not preclude the plaintiff from entering into any other agreement or relationship with his competitors; that the plaintiff had other other substantial lines of business including close-circuit television and sound system installation which are totally unrelated to the defendant's products; that the plaintiff's advertising, as evidenced by Yellow Page advertisements and various phonebooks throughout the state, MS Audio, Inc. was not required to nor does it display any Bogen trademark or logo or represent itself as a Bogen-related entity; that for the calendar year 1990 the plaintiff purchased $24,718.60 of the defendant's product from the Engineered Sound Line. During the calendar year 1991, the plaintiff purchased $15,357.30 of product from the Engineered Sound Line; that the plaintiff's total CT Page 8643 purchases from the defendant for two years, 1990 and 1991, respectively were $42,334.75 and $30,655.00; that the gross sales from the defendant to the plaintiff included the Engineered Sound Line purchases; that approximately 70 percent of the plaintiff's purchases of Bogen products were resold to subcontractors; that the plaintiff typically charged the subcontractor cost multiplied by 1.5 on the resale of defendant's products; that for the calendar year 1990, approximately $29,641.31 of the dollar value of the plaintiff's purchases from the defendant were resold to subcontractors at a price of cost multiplied by 1.5 resulting in gross sales for the plaintiff of approximately $44,462. for that year (total sales from the defendant to plaintiff in calendar year 1990 of $42,344.75 times 70 percent of sales to subcontractors times 1.5 markup on sales to subcontractors); that for calendar year 1991 approximately $21,458.50 of the dollar value of the plaintiff's purchases from the defendant were resold to subcontractors at a price of cost multiplied by 1.5 resulting in gross sales for the plaintiff of approximately $32,187 for that year (total purchases from the defendant by the plaintiff in calendar year 1991 of $30,655.00 times 70 percent of sales to subcontractors times 1.5 markup on sales to subcontractors), that the balance of purchases from the defendant by the plaintiff totalled $12,000 for calendar year 1990 and $9,000 for calendar year 1991; that at most the plaintiff's gross sales relating to the defendant's product represents approximately 15 to 20 percent of the plaintiff's total gross sales for its fiscal year 1991; that the gross sales of the plaintiff's business for the fiscal year ending 1991 was approximately $294,000 and that recent gross sales have averaged in excess of $300,000 per year. The court concludes that although these percentages of gross sales in the two years in question were a significant portion of the total gross sales for those two years they would not appear to have a devastating impact on the plaintiff's business in view of his other business and the reasonable probability that he could obtain a competitive line of intercom equipment. This evidence persuades the court that the written agreement as interpreted by the parties between December 5, 1988 and June 21, 1990 when it was amended orally did not give plaintiff "the right to engage in the business of offering, selling or distributing Engineered Sound Full Products under a marketing plan or system prescribed in substantial part by franchisor.
Plaintiff contends that the oral modification of June 21, 1990, which prohibited one ESC from bidding Bogen Engineered Sound Line products on a job for which the specifications had been provided by another Connecticut ESC is in effect a marketing plan or system prescribed in substantial part by a franchisor. Plaintiff contends this agreement was implemented over the objections of MS despite the admitted potential for conflicts among Bogen franchisees. Plaintiff also argues that other aspects CT Page 8644 of Bogen's promotional policies create such a prescriptive plan. These promotional policies include seminars, attending trade shows, issuing instructional handbooks, publishing weekly bulletins, outlining competitive ways to sell Bogen products and sample specification forms. This argument is applicable to the written contract also.
The court has previously concluded after examination of the written contract and a review of the evidence of the arrangement between the parties that there was insufficient evidence that the arrangement between the parties was pursuant to a marketing plan or system prescribed in substantial part by a franchisor. The Bogen Engineered Sound Full Line Product is an intercom system which is frequently sold when a facility is designed either for new construction or remodeling and the owner through an architect or engineer solicits specifications for such a system for various contractors and engineers through a bid process.
Likewise, there is nothing in the oral modification of the agreement which prohibits the plaintiff from preparing specifications either with Bogen Products or a competitor's products in submitting these specifications to the owners. Presumably the marketplace or the owner will determine what specifications will be adopted and used as a basis for the bidding process. Once specifications have been adopted there is nothing in the oral modification which prevents the plaintiff or any other Connecticut ESC which has been unsuccessful in getting the owner to adopt its specifications from bidding a competitive product. Inasmuch as the bidding process in Connecticut does not allow proprietary specifications, there i, nothing in the oral agreement which prohibits the several Connecticut ESCs from simultaneously submitting specifications on Bogen products to an owner. Furthermore, the oral agreement has no effect whatsoever on the portion of the market wherein open bidding is not required. After examining all the factors that are relevant to the determination that a given entity is operated under a marketing plan or a system prescribed in substantial part by an alleged franchisor, the court concludes in this instance that the plaintiff has failed to establish that either the written contract or its oral modification required it to operate under a marketing plan or a system prescribed in substantial part by Bogen. The concept of franchise as defined by Connecticut Statutes and interpreted by the courts requires controls far exceeding those permissible under the status of "authorized dealer", Sorisio v. Lenox, Inc.701 F. Sup. 950, 961 (1988).
Accordingly the plaintiff's request for a temporary injunction reinstating the plaintiff as an Engineered Sound Full Line Contractor and restraining the defendant from terminating the CT Page 8645 plaintiff's status as an Engineered Sound Full Line Contractor is denied.
Dorsey, J.