**RUDEL MACHINERY CO., INC., Plaintiff,**

v.

**GIDDINGS & LEWIS, INC., Defendant.**

**No. 3:97CV1115 RNC.**

United States District Court, D. Connecticut.

July 15, 1999.

---

David Paul Friedman, Marcy Tench Stovall, Zeldes, Needle & Cooper, Bridgeport, CT, for Plaintiff.

Paul D. Sanson, Stephanie Marmelstein Gitlin, Shipman & Goodwin, Hartford, CT, for Defendant.

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

CHATIGNY, District Judge.

Plaintiff Rudel Machinery Co., Inc., a sales representative for machine tool manufacturers, brings this action in two counts against defendant Giddings & Lewis, Inc., a manufacturer of machine tools and assembly systems. Under a contract between the parties executed in December 1991, plaintiff promoted defendant's products in Connecticut, New York, and parts of New Jersey and Pennsylvania until June 8, 1995, when defendant terminated the contract. In count one, plaintiff claims that the parties' contractual relationship constituted a franchise within the meaning of the Connecticut Franchise Act ("CFA"), Conn. Gen.Stat. § 42–133e(b), and that defendant violated the Act by terminating the relationship without good cause and without giving written notice of termination at least sixty days in advance of the termination date. *See* Conn. Gen.Stat. § 42–133f(a). In count two, plaintiff claims that the termination also violated the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen.Stat. § 42–110a, *et seq.*

Defendant has moved for summary judgment on both counts. Defendant contends that it is entitled to summary judg-

ment on count one because plaintiff's business was not "substantially associated with the franchisor's trademark, service mark, tradename, logotype, advertising or other commercial symbol designating the franchisor or its affiliate," Conn. Gen.Stat. § 42–133e(b)(2), and therefore the Agreement between the parties did not constitute a franchise under the CFA. Defendant contends that summary judgment should be granted on count two because plaintiff cannot prove that defendant engaged in unfair conduct cognizable under CUTPA. The court agrees and, accordingly, defendant's motion for summary judgment is granted.[1]

## I. BACKGROUND

The record before the court, viewed most favorably to the plaintiff, would permit a jury to find the following facts.

For approximately forty-five years prior to 1995, plaintiff served as a sales representative for defendant. (Ensinger Aff., ¶ 4.) The relationship between the parties was memorialized in a succession of agreements, pursuant to which plaintiff represented defendant's products in designated areas. (*Id.,* ¶ 5.) The parties executed the most recent agreement on December 18, 1991 ("the Agreement"). (*Id.;* Def.'s R. 9(c)1 Statement, ¶ 13;[2] Representative's Agreement dated December 18, 1991, Def.'s App. Ex. C.)

The Agreement "supersede[d] all oral and written statements and Agreements relating to the sale of Designated Products by Representative ... and constitute[d] the entire Agreement between the parties relating thereto ...." (*Id.,* ¶ 13.) The Agreement permitted either party to terminate the contract "without cause upon written notice to the other part[y] setting forth the effective date of termination," subject only to certain provisions concerning payment of commissions on outstanding orders. (*Id.,* ¶ 8(b).)

Pursuant to the Agreement, plaintiff was authorized to represent defendant's products in most of plaintiff's New York and western New York territories, which included all of Connecticut, all of New York, northern New Jersey and three counties in Pennsylvania. (Def.'s R. 9(c)1 Statement, ¶¶ 14 and 15.) Prior to December 1991, plaintiff also represented defendant's products in its southern and southeastern territories, which included North Carolina, South Carolina, Virginia, Alabama, Tennessee, Georgia and Florida. However, defendant terminated its relationship with plaintiff in those two territories in December 1991. (*Id.,* ¶ 18.)

From December 1991 to 1995, in the two territories where plaintiff continued to represent defendant (i.e. the New York and western New York territories described above), plaintiff also represented approximately twenty other manufacturers. (*Id.,* ¶ 23.) In the four sales areas where plaintiff did not represent defendant (the New England, mid-Atlantic, southern, and southeastern sales areas), plaintiff represented numerous other machine tool manufacturers.[3]

During the time the Agreement was in effect, plaintiff represented over forty ma-

---

1. Defendant also claims that no "franchise" existed within the meaning of the statute because plaintiff was not granted the right to "engage in the business of offering, selling or distributing" defendant's goods. Conn. Gen. Stat. § 42–133e(b)(1). Because the court concludes that plaintiff cannot satisfy the "substantial association" prong of the definition of a franchise, it is unnecessary to reach this issue.

2. Unless otherwise noted, all references to defendant's Local Rule 9(c)(1) statement of

facts are to paragraphs admitted by plaintiff in its Local Rule 9(c)(2) statement, D. Conn. L. Civ. R. 9(c)(2).

3. The four areas where plaintiff did not represent defendant encompassed Maine, Vermont, Massachusetts, New Hampshire, Rhode Island, eastern Pennsylvania, southern New Jersey, Delaware, Maryland, Virginia, North Carolina, South Carolina, Alabama, Tennessee, Georgia and Florida. (*Id.,* ¶¶ 6–15, 20–21.)

chine tool manufacturers. (*Id.*, ¶ 22.) There were no customers to whom plaintiff promoted only defendant's products, and none of plaintiff's employees exclusively promoted defendant's products. (*Id.*, ¶¶ 26–27.)

Pursuant to the terms of the Agreement, plaintiff and defendant were separate, independent entities. (*Id.*, ¶ 30.) In that regard, the Agreement states: "[t]he relationship of the parties ... shall be deemed to be that of each party acting as an independent contractor with the right of each party being reserved only to accept or reject the performance of the other party and without any right to control or direct the performance of the obligations of the other party." (Representative's Agreement dated December 18, 1991, ¶ 6, Def.'s App. Ex. C.) The word "franchise" does not appear in the Agreement. (Representative's Agreement dated December 18, 1991, Def.'s App. Ex. C.)

Defendant had no control over plaintiff's hours and days of operation. Defendant did not inspect plaintiff's offices or audit plaintiff's financial records or books. (Def.'s R. 9(c)1 Statement, ¶¶ 36–38.)

During the period of the Agreement, plaintiff's stationary, letterhead and business cards contained no reference to defendant's name. (*Id.*, ¶¶ 31–32.) Plaintiff's employees wore no uniforms bearing defendant's name. (*Id.*, ¶ 35.) There was no sign either inside or outside plaintiff's offices referencing defendant's name, and plaintiff's employees did not mention defendant's name when answering their phones. (*Id.*, ¶¶ 33–34.)

During this time, plaintiff distributed to customers a "line card," which listed all the machine tool manufacturers and products it represented in each territory. (*Id.*, ¶ 29; *see also* Plaintiff's Line Card, Def.'s App. Ex. I.) Of thirty-seven types of machines listed on the card for the New York territory, ten were manufactured by defendant. (*Id.*) Plaintiff also distributed brochures and flyers describing various manufacturers, including defendant. (Def.'s R.

9(c)1 Statement, ¶ 28.) On most of the brochures and flyers, plaintiff placed stickers that read "Distributed by Rudel Machinery Company, Inc." (Steck Dep., pp. 276–77, Pl.'s App. Ex. C.)

During the period of the Agreement, defendant set the prices, terms and conditions of sale for all its products. (Def.'s R. 9(c)1 Statement, ¶ 42.) Plaintiff did not maintain an inventory of defendant's products. (*Id.*, ¶ 47.) With the exception of some spare parts, and the Winslow, Davis, and Scheffield products, plaintiff did not have authority to make a binding offer to sell defendant's products (Pl.'s R. 9(c)2 Statement, ¶ 41); or enter into a contract with a customer for the sale of defendant's products (Def.'s R. 9(c)1 Statement, ¶ 43); and did not purchase products from defendant for resale to customers. (*Id.*, ¶ 44.) When contracts for sale of defendant's products were formed, the contracts were between defendant and the customer, defendant invoiced the customer directly, and the customer paid defendant directly. (*Id.*, ¶¶ 45–46.) Plaintiff was not responsible for delivery, installation or service of defendant's products. (*Id.*, ¶¶ 48–50.)

Total sales arranged by plaintiff for all the manufacturers it represented in the years 1992–1995 were as follows: 1992— $ 71,581,530; 1993—$ 50,391,133; 1994— $ 29,342,096; 1995—$ 26,982,391. (Giddings & Lewis Summary 1986–1995, Def.'s App. Ex. K.) Plaintiff's sales of defendant's products during that period were: 1992— $ 46,727,520; 1993—$ 7,329,254; 1994— $ 4,167,330; 1995—$ 9,260,844. (*Id.*) Overall gross profits for the years 1992–1995 were as follows: 1992—$ 4,032,704; 1993—$ 2,424,811; 1994—$ 1,671,660; 1995—$ 1,373,251. (*Id.*) Gross profits attributable to commissions on defendant's products during that period were: 1992— $ 2,492,524; 1993—$ 418,504; 1994— $ 218,292; 1995—$ 356,886. (*Id.*)

Between 1992 and 1995, 38% of the value of plaintiff's total sales derived from

sales of defendant's products,[4] and 37% of plaintiff's total gross profit derived from commissions on sales of defendant's products.[5] (Giddings & Lewis Summary 1986–1995, Def.'s App. Ex. K.)[6] Earnings from sales of defendant's products comprised the most significant individual portion of plaintiff's total earnings. (Pl.'s R. 9(c)2 Statement, ¶ 9.)

Defendant's executives decided to terminate the Agreement due to plaintiff's representation of competing product lines in its southern sales area. (Pierce Dep., pp. 151–52, Pl.'s App. Ex. A.) In early June 1995, Mark Logan, defendant's Vice President for North American Sales, told Bob Gunn, Rudel's President, that defendant was terminating the Agreement. (Def.'s R. 9(c)1 Statement, ¶ 16.) On June 8, 1995, defendant sent a letter to plaintiff that purported to terminate the Agreement pursuant to the provision allowing either party to terminate the Agreement without cause and without prior notice. (Id., ¶ 17.) Two years later, plaintiff commenced this action.

**4.** This figure represents the sum of plaintiff's Giddings & Lewis sales figures for the years 1992–1995, divided by the sum of total sales for those years, times 100. (See Giddings & Lewis Summary 1986–1995, Def.'s App. Ex. K.) Both plaintiff and defendant point to specific years to show higher or lower percentages. (See id.) Due to the apparent fluctuation in the market for these products, it is appropriate to analyze the data in terms of the overall results. Because the Agreement commenced in December 1991, and the data is organized according to year, it is appropriate to begin the calculations with the 1992 calendar year.

**5.** This figure represents the sum of gross profits derived from commissions attributable to defendant's products for 1992–1995, divided by the sum of the total gross profits for those years, times 100. (See Giddings & Lewis Summary 1986–May 1995, Def.'s App. Ex. K.)

**6.** Plaintiff argues that the statistics for 1995 are skewed because its relationship with defendant was curtailed after only the first five months of that year. Accounting for plaintiff's objection with assumptions based on

## II. DISCUSSION

### A. COUNT ONE—CONNECTICUT FRANCHISE ACT

■ The remedial provisions of the CFA stipulate in pertinent part that: "No franchisor shall ... terminate [or] cancel ... a franchise, except for good cause." Conn. Gen.Stat. § 42–133f(a). The statute also requires the franchisor to "give the franchisee written notice of such termination [or] cancellation ... at least sixty days in advance to such termination [or] cancellation with the cause stated thereon ...." *Id.* These statutory requirements override any contractual provisions to the contrary in a covered franchise agreement, and the statute voids any contractual waivers of a franchisee's statutory protections. Conn. Gen.Stat. § 42–133f(f).

The statute defines a "franchise" as:

an oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial

data for the year in which defendant's products constituted the greatest percentage of plaintiff's business (1992) does not change the analysis significantly. If we assume the percent of total sales attributable to defendant's products for the five month period achieved the historical high of 65% (the 1992 figure), we must assume that total sales for that period were $ 14,247,452. Using this figure for total sales instead of the $26,982,391 figure (which reflects actual total sales for the entire year) yields a hypothetical maximum percentage of total sales attributable to defendant's products for the period January 1992 through May 1995 of 41%. Similarly, if we assume the percent of gross profit attributable to defendant's products for the five month period in 1995 achieved the historical high of 62% (the 1992 figure), we must assume that overall gross profit for that period was $ 575,622. Using this figure instead of the $ 1,373,251 figure (which reflects actual gross profit for the entire year) yields a hypothetical maximum percentage of gross profit attributable to defendant's products for the period January 1992 through May 1995 of 40%. (See Giddings & Lewis Summary 1986–1995, Def.'s App. Ex. K.)

part by a franchisor ...; and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade-name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate .... [7]

Conn. Gen.Stat. § 42–133e(b). The primary issue regarding count one is whether the relationship between the parties satisfies this definition such that the contractual provision allowing termination of the Agreement without prior notice or cause is invalidated by § 42–133f(a). Viewing the evidence most favorably to plaintiff, the court concludes as a matter of law that the "substantial association" requirement in subdivision (2) is not satisfied and, accordingly, that the relationship between the parties does not constitute a franchise under § 42–133e(b).

■ The Act itself does not define the phrase "substantially associated." However, the Connecticut Supreme Court's opinion in *Muha v. United Oil Co.*, 180 Conn. 720, 433 A.2d 1009 (1980), sheds light on the meaning of the phrase.[8] In *Muha*, a service station operator sued a wholesaler who supplied him with furnishings, property and CITGO gasoline, but who had no ownership rights over any trademark. The court held that the service station operator was not substantially associated

with the wholesaler's trademark because the wholesaler owned no trademark. *Id.* at 726–27, 433 A.2d 1009. The court then stated:

> Except for certain batteries, none of the automotive parts or accessories sold or installed by the plaintiffs bears the CITGO trademark. As noted above, the leases and the sales and equipment agreements do not require the plaintiffs to sell only CITGO petroleum products. Therefore, even if United had a trademark and prescribed in substantial part a marketing plan, the plaintiffs' activities were not "substantially (related) with the franchisor's trademark."

*Id.* This passage strongly indicates that the state Supreme Court would require a plaintiff seeking the protections of the CFA to show that its business is exclusively, or nearly exclusively, associated with the trademark of the defendant.

■ The Second Circuit has also indicated that the CFA does not apply to a business relationship unless there is a very high degree of association between the business of the party claiming franchisee status and the alleged franchisor. In *Grand Light and Supply Co., Inc. v. Honeywell, Inc.*, 771 F.2d 672, 677–78 (2d Cir.1985), the Court noted that:

> The purpose of the statute was to prevent a franchisor from taking unfair advantage of the relative economic

---

**7.** The definition continues: "and includes any agreement between a manufacturer, refiner or producer and a distributor, wholesaler or jobber, between a manufacturer, refiner or producer and a retailer, or between a distributor, wholesaler or jobber and a retailer ...." Conn. Gen.Stat. § 42–133e(b). Though this phrase might superficially suggest that any such agreement automatically constitutes a franchise, irrespective of whether there is substantial association or a marketing plan and so forth, "this language does not excuse the plaintiffs from establishing the elements which constitute a franchise." *Aurigemma v. Arco Petroleum Products Co.*, 698 F.Supp. 1035, 1038 (D.Conn.1988) (considering comparable language in the Connecticut Fair Conduct in Franchising Act, Conn. Gen.Stat. § 42–1331(b) (1988)).

Literally interpreted, the statutory language suggests that only the portion of a plaintiff's business that is conducted pursuant to a defendant's marketing plan need be substantially associated with the defendant's trademark. However, the Second Circuit, noting that such an interpretation would effectively eliminate the substantial association requirement, has held that such an interpretation is improper. *Grand Light and Supply Co., Inc. v. Honeywell, Inc.*, 771 F.2d 672, 676–77 (2d Cir.1985).

**8.** "Where the substantive law of the forum state is uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity." *McCarthy v. Olin Corp.*, 119 F.3d 148, 153 (2d Cir.1997).

weakness of the franchisee.... In the ordinary franchise situation, *typically involving an exclusive relationship,* termination by the franchisor could result in economic disaster for the franchisee. Where the franchisee is completely dependent on the public's confidence in the franchised product for *most or all of his business,* abrupt severance of the franchise tie, without good cause and without sufficient notice, could spell ruination.

*Id.* at 677 (emphasis added). The Court of Appeals analyzed the facts of the case before it in terms of this statement of the purpose of the statute. It concluded that "the Act was not intended to cover a relationship such as the one at issue" because the plaintiff was not dependent upon "the public's confidence in the franchised product for most or all of his business ...." *Id.* ("No such dependence existed here. Grand Light derived a scant three percent of its business from Micro Switch products.").

The analysis in *Grand Light* suggests that the CFA does not apply unless the plaintiff shows that most, if not all, of its business derives from association with the defendant.[9] Though the *Grand Light* court did not explicitly cast its analysis in terms of the "substantial association" prong of the statutory definition, its reliance on the dicta in *Muha* quoted above indicates that its analysis went to that prong. *See id.* ("the court [in *Muha*] suggested that the absence of exclusivity in the ... relationship [between the parties] would have been significant even if there had been a trademark").[10] *See also Sorisio v. Lenox, Inc.,* 701 F.Supp. 950, 961 (D.Conn.1988) (using a "most if not all of [plaintiff's] business" standard in analyzing the "substantial association" prong of the statutory definition), *aff'd,* 863 F.2d 195 (2d Cir.1988) (per curiam) (describing the district court's opinion as "excellent").[11]

9. A number of district courts have cited *Grand Light* for the proposition that the CFA does not require exclusive association. *See, e.g., Chem–Tek, Inc. v. General Motors Corp.,* 816 F.Supp. 123, 129 (D.Conn.1993); *Sorisio v. Lenox, Inc.,* 701 F.Supp. 950, 961 (D.Conn. 1988); *Leisure Unlimited, Inc. v. Department 56, Inc.,* No. 3:95CV2039, 1996 WL 684406, *4 (D.Conn., May 3, 1996); *see also Hartford Electric Supply Co. v. Allen Bradley Co., Inc.,* No. CV 96562061S, 1997 WL 297256, *8 (Conn.Super.Ct., May 28, 1997) (citing *Chem–Tek* for the proposition that substantial association "does not require exclusivity"). These courts rely on the following passage from *Grand Light*:

In *Muha,* the [Connecticut Supreme Court] held that no franchise relationship existed because the defendant lessor owned no trademark. 180 Conn. at 726–27, 433 A.2d 1009 ... However, the court suggested that the absence of exclusivity in the lessor/lessee relationship would have been significant even if there had been a trademark: "[T]he leases and the sales and equipment agreements do not require the plaintiffs to sell only CITGO petroleum products. Therefore, even if [defendant] had a trademark and prescribed in substantial part a marketing plan, the plaintiffs' activities were not 'substantially related [sic] with the franchisor's trademark.'" *Id.* at 726, 433 A.2d 1009 .... Although this statement is

dictum, we take it as a clear indication that *while the state's highest court might not require that the entire business be associated with the franchisor's trademark,* it would at least insist that more than three percent of the franchisee's business be involved.

*Grand Light,* 771 F.2d at 678 (emphasis added). This passage is best understood as an acknowledgment that the issue of exclusivity remains open despite the *Muha* court's rather unequivocal language suggesting that exclusivity is required. The passage does not state that exclusivity is not required.

10. Moreover, in *Petereit v. S.B. Thomas, Inc.,* 63 F.3d 1169, 1180–81 n. 2 (2nd Cir.1995), the Second Circuit clarified that the degree of a plaintiff's reliance upon defendant's products "goes to the 'substantial association' prong of the franchise definition."

11. Plaintiff relies upon *Hydro Air of Connecticut, Inc. v. Versa Technologies, Inc.,* 599 F.Supp. 1119 (D.Conn.1984), for the proposition that the CFA applies to the relationship between a manufacturer and its sales representative even when the representative serves many manufacturers. However, as noted by the District Court in *Sorisio,* the reasoning used by the court in *Hydro Air* was invalidated by the Second Circuit in *Grand Light,* 771 F.2d at 678. *See Sorisio,* 701 F.Supp. at 961.

■ Requiring a plaintiff in a CFA case to demonstrate that most or all of its business is associated with the defendant comports with the statute's legislative history.[12] The record of the debate on the bill that became the CFA shows that the bill's supporters wanted to protect individuals—particularly unsophisticated individuals—whose economic survival depends on a franchise relationship. For example, in introducing the legislation on the floor of the House of Representatives, the sponsor of the legislation in that chamber stated:

> [O]ur committee has heard testimony from many franchisees who have literally sunk their life savings into their businesses and then have seen their investments and their labors go down the drain.... [W]e believed that limits must be set on the too often arbitrary and freewheeling operations of some of the giant franchising companies. We believe our State must assume a minimum level of protection to the small business man from a corporation which suddenly and capriciously snatches away his livelihood.

H.R. Proc., 1972 Sess., p. 2777 (Statement of Rep. Webber). Another supporter of the bill stated:

> [T]he franchisee ... must be protected from the occasional company which either because of financial difficulties or through the kind of management that seeks to take advantage, will take advantage of unsuspecting persons and will lure them into situations in which they can be hurt very badly and forced into a bankruptcy or worse.

*Id.,* p. 2784 (Statement of Rep. Ajello). The legislators' concern about individuals' "life savings" and "livelihood[s]," and the prospect of their being "forced into ... bankruptcy or worse," presupposes that the people the legislators sought to protect were dependent upon the products of the franchisor for all or most of their business.

The record in this case, even when viewed most favorably to the plaintiff, does not support a finding that most or all of its business was associated with defendant's trademark. During the period of the Agreement, plaintiff generated average annual sales of more than $35,000,000 and earned an average annual profit of roughly $ 2,500,000. (Giddings & Lewis Summary 1986–1995, Def.'s App. Ex. K.) Sales of defendant's products constituted no more than about 41% of plaintiff's overall business and the proportion of plaintiff's gross profit attributable to commissions on sales of defendant's products was around 40%.

Plaintiff contends that its business was substantially associated with defendant because during certain years its sales of defendant's products accounted for as much as 60% of its overall business—for example, 1992, when the proportion of its business attributable to sales of defendant's products reached 65%. (*See* Giddings & Lewis Summary 1986–1995, Def.'s App. Ex. K.) But this approach is unsound. One might just as well focus on years when defendant's products represented a particularly low proportion of plaintiff's overall business—for example, 1993 or 1994, when the proportion was 15% and 14%, respectively. In light of the wide fluctuations in the annual figures contained in the record, it makes more sense to look at the overall figures for the entire period of the Agreement.

■ Plaintiff also claims that it was substantially associated with defendant by virtue of its forty-five year history of representing defendant's products. However,

---

12. The Connecticut Supreme Court uses a comprehensive approach in construing the provisions of state statutes. *See, e.g., Grigerik v. Sharpe,* 247 Conn. 293, 721 A.2d 526 (1998) ("[t]he process of statutory interpretation involves a reasoned search for the intention of the legislature .... we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter'").

the duration of a commercial relationship does not appear to be a significant factor in the substantial association inquiry. In *Grand Light*, the fact that the plaintiff had distributed the defendant's products for more than 30 years was not mentioned in the analysis. *See* 771 F.2d at 676–678.[13]

■ Plaintiff asserts that defendant's termination of their relationship was financially disastrous. Whether evidence of financial harm is relevant to the substantial association inquiry is unclear.[14] Assuming that such evidence is relevant, plaintiff's showing consists of affidavits asserting that the company's entire equity has been wiped out, that termination of the relationship has been "financially disastrous" and that the company is barely surviving. (Smith Aff., ¶¶ 12–14, 17; *see also* Ensinger Aff., ¶¶ 19–25.) These averments are presented as conclusory statements, without any supporting documentary evidence. Such conclusory statements do not create a genuine issue of material fact in light of defendant's showing that its products accounted for less than half of plaintiff's business.[15]

■ Plaintiff points out that its "line cards" for the two territories where it represented defendant listed defendant's products, that it affixed a sticker bearing its name to copies of defendant's flyers and brochures and that it was widely recognized in the trade as the leading distribu-

13. If one considers the data in the record going back to 1986, which is the earliest data in the record, the outcome of the analysis does not change significantly. Between 1986 and 1995, 42% of the total sales generated by plaintiff were sales of defendant's products, and 39% of plaintiff's total gross profit derived from commissions earned from sales of defendant's products. (The first figure represents the sum of plaintiff's sales of Giddings & Lewis products for the years 1986–1995, divided by the sum of total sales for those years, times 100. The second figure represents the sum of gross profits derived from commissions attributable to sales of defendant's products for 1986–1995, divided by the sum of the total gross profits for those years, times 100. (*See* Giddings & Lewis Summary 1986–1995, Def.'s App. Ex. K.)) Making the same adjustments for the skewed 1995 data as described in footnote 6 yields 43% for the hypothetical maximum percentage of total sales attributable to defendant's products for the period January 1986 through May 1995; and 40% for the hypothetical maximum percentage of gross profit attributable to sales of defendant's products for the period January 1986 through May 1995.

14. Some courts have indicated that such evidence is relevant. *See, e.g., Chem–Tek*, 816 F.Supp. at 129 ("[t]he franchisee must be sufficiently dependent on the franchisor that termination would be not only harmful, but disastrous.... Chem–Tek is entitled to show that the abrupt termination had a disastrous effect on its business"). These courts have relied on the passage from *Grand Light* quoted above. *Grand Light*, 771 F.2d at 677 ("In the ordinary franchise situation, typically in-

volving an exclusive relationship, termination by the franchisor could result in *economic disaster* for the franchisee. Where the franchisee is completely dependent on the public's confidence in the franchised product for most or all of his business, abrupt severance of the franchise tie, without good cause and without sufficient notice, *could spell ruination*. No such dependence existed here. Grand Light derived a scant three percent of its business from Micro switch products. Termination, although harmful from Grand Light's point of view, was *not catastrophic*." (Emphasis added.)) Though the quoted passage supports the view that evidence of severe financial harm is relevant, such evidence is not a substitute for evidence demonstrating that most or all of a plaintiff's business is associated with the defendant's trademark. In *Grand Light*, the Second Circuit considered evidence about the proportion of plaintiff's business derived from sales of defendant's products, not evidence concerning the plaintiff's financial condition. Moreover, the "most or all" standard alone, without reference to the extent of damage done by the termination of the relationship, comes closer to what the Connecticut Supreme Court appears to have said in the *Muha* dictum about the substantial association prong—that is, that straightforward exclusivity is required.

15. Typically, franchisees threatened with severe economic harm arising from termination bring suit under the CFA without delay and seek immediate injunctive relief. Plaintiff did not file this action until two years after the termination and did not seek an injunction. Plaintiff remains in business today, more than four years after the termination occurred.

tor of defendant's products. Assuming that this evidence is relevant,[16] when viewed in the context of the entire record it does not provide a basis for a reasonable jury finding of substantial association. Plaintiff's line cards bore the names of many other manufacturers and listed many other products; plaintiff affixed stickers to other manufacturers' brochures; there was no customer to whom plaintiff promoted only defendant's products; none of plaintiff's employees exclusively promoted defendant's products; plaintiff's stationary, letterhead, business cards, and uniforms contained no reference to defendant's name; there was no sign either inside or outside plaintiff's offices referencing defendant's name; and plaintiff's employees did not use the defendant's name when answering calls. *Compare Grand Light*, 771 F.2d at 678 (evidence that defendant's products were labeled with the manufacturer's name while other products marketed by plaintiff were sold generically and that plaintiff used shipping labels and promotional devices with defendant's trademark did not provide a basis for finding that plaintiff had a franchise protected by the CFA). Moreover, in most of the states in which plaintiff operated, it did not represent defendant.[17]

██ The court notes that the dictionary definition of "substantial" is "considerable in quantity" or "being largely but not wholly that which is specified." Merriam Webster's Collegiate Dictionary 1174 (10th ed.1993). Clearly, defendant's products constituted a "considerable" or "large" portion of plaintiff's business. However, in addition to the text of the statute, the court must take into consideration the Connecticut Supreme Court's dicta in *Muha* suggesting that to satisfy the substantial association prong exclusivity is required; the Second Circuit's discussion in *Grand Light* indicating that most or all of the plaintiff's business must derive from association with the defendant; the Second Circuit's approval in *Sorisio* of the District Court's use of a "most if not all of plaintiff's business" standard; and the legislators' focus on protecting small business people who are dependant on a franchise relationship for their livelihood. In light of all these considerations, the court concludes that the substantial association prong is not satisfied and, accordingly, that the parties' contractual relationship was not governed by the remedial provi-

**16.** *See, e.g., Chem–Tek,* 816 F.Supp. at 129 (allowing plaintiff to withstand motion to dismiss in light of allegations that its representatives used letterhead and business cards bearing defendant's logotypes and trademarks and that representatives identified themselves to customers as "authorized" manufacturers and distributors of General Motors products). *See also Carlos v. Philips Business Systems, Inc.,* 556 F.Supp. 769, 776 (E.D.N.Y.1983) (applying Connecticut Franchise Act).

**17.** Plaintiff relies heavily on *Hartford Electric Supply Co. v. Allen–Bradley Co., Inc.,* No. CV 96562061S, 1997 WL 297256 (Conn.Super.Ct., May 28, 1997). In that case, the trial judge made a finding of fact that A–B's termination of the agreement would result in loss of half of plaintiff's gross annual sales of $20,000,000, as well as "the opportunity to act as distributor for many of the other manufacturers it represent[ed] whose products [we]re complimentary to A–B's." *Id.* at *3. Later, with no reference to that factual finding, the court concluded that the substantial association prong was satisfied because "HESCO distributed A–B catalogues and promotional materials with both companies' name on it, A–B's sign was prominently displayed on HESCO's premises, HESCO's fliers contained the A–B logo. Also, HESCO was widely recognized as the leading distributor of A–B products in Connecticut for 50 years, and customers in the trade thought of HESCO and A–B as 'one and the same.'" *Id.* at *8. Though there are some similarities between *Hartford Electric* and the instant case, *Hartford Electric* is readily distinguishable. In that case, sales of the defendant's products accounted for 50% of the plaintiff's business; the plaintiff got an unspecified additional amount of business from other manufacturers because it sold defendant's products; the plaintiff did not serve as a distributor of comparable products in areas where it did not represent the defendant; the plaintiff did not represent competitors of the defendant; and the circumstantial evidence of association with defendant's tradename was stronger than it is here.

sions of the CFA.[18] Accordingly, defendant's motion for summary judgment as to the first count is granted.

## B. COUNT TWO—CONNECTICUT UNFAIR TRADE PRACTICES ACT

█ The Connecticut Unfair Trade Practices Act provides, in pertinent part, that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen.Stat. § 42–110b(a). "In determining whether certain acts constitute a violation of [CUTPA]," *Williams Ford, Inc. v. Hartford Courant Co.*, 232 Conn. 559, 591, 657 A.2d 212 (1995), the Connecticut Supreme Court has

> adopted the criteria set out in the cigarette rule by the federal trade commission ... (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise ... (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)].

Id. (internal quotations omitted; bracketed text in original). "[A]ll three criteria need not be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three ...." *Associated Investment Co. Ltd. Partnership v. Williams Associates IV*, 230 Conn. 148, 156, 645 A.2d 505 (1994).[19]

Plaintiff claims that defendant's termination of their contractual relationship violated the first of these three criteria in that the termination offended public policy embodied in the CFA. However, the court has determined that the CFA does not apply to this action. Accordingly, this aspect of plaintiff's CUTPA claim must be rejected. *See Sorisio*, 701 F.Supp. at 962 n. 9.

█ Turning to the second of the three CUTPA criteria, plaintiff claims that defendant acted immorally, unscrupulously, oppressively or unethically in that the termination was not based on good cause and was not preceded by prior notice and an opportunity to cure any deficiencies in performance.[20] This claim fails as a matter of

---

**18.** Plaintiff invokes the canon of statutory construction that remedial statutes are "to be liberally construed in favor of those whom the legislature intended to benefit," *Hartford Fire Insurance Co. v. Brown*, 164 Conn. 497, 502, 325 A.2d 228 (1973). However, that maxim, by its very terms, is not applicable to the interpretive question of whether a party is among those whom the legislature intended to benefit.

**19.** The Connecticut Supreme Court has noted that:

> The independent nature of the consumer criterion does not mean that every consumer injury is legally unfair .... To justify a finding of unfairness the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided.... This test is equally applicable when a business person or competitor claims substantial injury.

*Williams Ford*, 232 Conn. at 592, 657 A.2d 212 (internal quotation marks and citations omitted). *See also McLaughlin Ford, Inc. v. Ford Motor Company*, 192 Conn. 558, 569–71, 473 A.2d 1185 (1984) (franchisee's claim that CUTPA was violated on basis of substantial injury criterion when manufacturer exercised contract right to open a competing dealership in close proximity to plaintiff was unsuccessful because loss of plaintiff's business did not outweigh benefits to consumers from increased competition).

**20.** In connection with this claim, plaintiff points out that it was one of the most successful representatives of defendant's products in the United States; that it had represented defendant's products for forty-five years; that its ability to compete following termination of the Agreement was limited because the marketing plan under which it operated made it overly dependent on defendant; and that the alleged reason for the termination—the fact that it competed with defendant in the southern sales area—was caused by defendant's own decision in December 1991 to terminate

law because of the provision of the Agreement conferring the right to terminate the arrangement without cause and without prior notice, subject only to certain requirements regarding the payment of commissions on outstanding orders (which are not at issue here). Pursuant to that provision, defendant was permitted to terminate the contract for any reason it wished. Plaintiff has cited, and the court's own research has disclosed, no case in which an act authorized by a valid contractual provision has been found to constitute immoral, unscrupulous, oppressive or unethical conduct violative of the CUTPA rights of the contracting party. Even assuming that such conduct could give rise to a claim under the second prong of the cigarette rule, to be cognizable it would have to entail a degree of bad faith not shown here.[21]

■ Plaintiff contends that defendant also violated this aspect of CUTPA by unfairly "engag[ing] in activities to induce one of Rudel's key employees [John Giblin] to leave Rudel and obtain employment with the distributor/representative selected to replace Rudel." (Second Amended Complaint, ¶ 24.) In support of its motion for summary judgment, defendant adduces the testimony of Giblin, who denies having employment-related conversations with defendant prior to tendering his letter of resignation. Plaintiff opposes this evidence with testimony from J. Rick Pierce,

defendant's former vice president of sales. Viewing Pierce's testimony in the light most favorable to plaintiff, it suggests that he and Giblin spoke about the matter in 1991 or 1992—three or four years before Giblin's resignation from plaintiff—and that defendant's executives continued to think about luring Giblin away but did not engage him in further conversation. (Pierce Dep. at 54–56, 82, 97–98, Pl.'s App. Ex. A & Def.'s Reply, Ex. C.) Such conduct does not sink to the level of immoral, unscrupulous, oppressive or unethical behavior cognizable under CUTPA. *Compare, e.g., Larsen–Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 656 A.2d 1009 (1995) (prior to taking position with competing company, defendant, who was plaintiff's president, engaged in a variety of fraudulent and deceptive practices designed to steal plaintiff's business); *Capitol City Personnel v. Franklin*, No. CV 910505367, 1997 WL 112802 (Conn.Super.Ct., Feb.26, 1997) (while still in plaintiff's employment, defendant launched competing business and recruited employees and solicited clients for her new business, taking them from plaintiff).[22]

■ Turning to the last of CUTPA's three criteria, plaintiff contends that it has suffered substantial injury as a result of defendant's termination, that this injury "is not outweighed by any countervailing benefit to consumers or to competition,

plaintiff's right to represent defendant in that area.

21. Notably, the element of the marketing plan that rendered plaintiff dependent upon defendant, the restrictions upon representing competing products, was itself authorized by a provision of the contract. (*See* Representative's Agreement dated December 18, 1991, ¶ 2(c), Def.'s App. Ex. C ("It is not Seller's policy to be represented by Representatives that are incumbered (sic) by conflicts of interest arising from the Representative representing competing products. Any Representative representing such competing products shall be subject to review to ascertain the impact of such competing product. Seller reserves the sole right to take reasonable business actions to insure that Representative uses Representa-

tive's best efforts at all times so as not to breach the provisions of paragraph (a) [entitled 'Promoting and Selling']. Such actions shall be cause for termination of this Agreement, if the Representative shall breach the provisions of said paragraph (a).")

22. Moreover, this claim appears to be time-barred under the applicable three year statute of limitations. Conn. Gen.Stat. § 42–110g(f). It is undisputed that Pierce left defendant's employment in April of 1994. (Pierce Dep., p. 6, Def.'s Reply, Ex. A.) This action was commenced on June 6, 1997. *See Fichera v. Mine Hill Corp.*, 207 Conn. 204, 209–12, 541 A.2d 472 (1988) (CUTPA limitations period commences with the occurrence of a violation, irrespective of whether the violation has been discovered or the injury has occurred).

and [that plaintiff] could not reasonably have avoided the injury." (Second Amended Complaint, ¶ 30.) This claim also fails as a matter of law. In light of plaintiff's assent to the provision of the Agreement allowing defendant to terminate the relationship without cause or prior notice; given the size and sophistication of plaintiff, and the fact that over half its business derived from manufacturers other than defendant; and in the absence of any allegations of duress regarding the formation of the contract, no reasonable fact finder could conclude that plaintiff "could not reasonably have avoided" the injury. *Williams Ford,* 232 Conn. at 592, 657 A.2d 212; *see McKeown Distributors, Inc. v. Gyp–Crete Corp.,* 618 F.Supp. 632, 644 n. 7 (D.Conn.1985) (expressing doubt that CUTPA could be construed to bar a party from conduct authorized by a contractual provision merely because it would result in substantial injury to the contract partner without a corresponding benefit to consumers).

Finally, plaintiff contends that all the alleged improper conduct taken together amounts to a violation of CUTPA. However, plaintiff has not shown that defendant's conduct violated any of CUTPA's three criteria to any degree. That being so, its CUTPA claim in the aggregate is necessarily insufficient as well.

Because each element of plaintiff's CUTPA claim fails as a matter of law, defendant is entitled to summary judgment on count two.

## III. *CONCLUSION*

Accordingly, defendant's motion for summary judgment is hereby granted. The action is dismissed. The Clerk will close the file.

So ordered.