**CONTRACTORS HOME APPLIANCE, INC., Plaintiff,**

v.

**CLARKE DISTRIBUTION CORPORATION, Defendant.**

**Civil Action No. 3:00 CV 1630(CFD).**

United States District Court, D. Connecticut.

March 21, 2002.

---

Martin A. Clayman, Kent D. Mawhinney, Clayman, Markowitz, Litman & Tapper, Bloomfield, CT, Christopher S. Acquanita, Murphy & Raccio, Wallingford, CT, for plaintiff.

Nicole J. Anker, William N. Berkowitz, Fiona S. Trevelyan, Alicia L. Downey, Hartford, CT, Holly M. Polglase, Campbell, Campbell & Edwards, East Hartford, CT, for defendant.

## *RULING ON MOTION FOR SUMMARY JUDGMENT*

DRONEY, District Judge.

The plaintiff, Contractors Home Appliance, Inc., ("Contractors") brings this action against Clarke Distribution Corporation ("Clarke") alleging violations of the Connecticut Franchise Act, Conn.Gen.Stat. §§ 42–133 *et. seq.*, and the Connecticut Unfair Trade Practices Act, Conn.Gen. Stat. § 42–110b, arising from Clarke's termination of a dealership agreement between the parties. Clarke has filed a motion to dismiss [Doc. # 5] [1].

## I. Facts[2]

Clarke is based in Hopkinton, Massachusetts and distributes "high-end" kitchen appliances, including those manufactured by Sub–Zero, Dynasty, Thermador, and Gaggenau, to retail dealers located throughout New England. Contractors, at all relevant times located in East Granby, Connecticut, sells kitchen appliances, primarily to contractors and home builders. In 1994, Clarke became Contractors' supplier of Sub–Zero appliances, when it took over the account from a competitor. In 1996, Clarke became Contractors' supplier of Thermador appliances, when Thermador discontinued direct sales and transferred its then-existing accounts to Clarke. Clarke and Contractors entered into their first written dealership agreement on July 15, 1997. On January 1, 2000, the parties entered into the dealership agreement that is the subject of this case ("Agreement"). That agreement provided that Contractors was authorized by Clarke to sell Sub–Zero, Dynasty, and Thermador appliances.[3] Un-

---

1. The Court previously ruled that it would treat Clarke's motion to dismiss as a motion for summary judgment under Fed.R.Civ.P. 56 because matters outside the pleadings had been presented during hearings on Contractors' application for preliminary injunction. The parties were given the opportunity to, and did, supplement the materials presented. The application for preliminary injunction was withdrawn on June 5, 2001 as Contractors had sold its business as of that date.

2. The following facts are taken from the Amended Verified Complaint and the parties' papers filed in connection with the instant motion and the motion for preliminary injunction and are undisputed unless otherwise indicated.

3. Contractors has indicated that, of the products it purchased from Clarke, it "primarily" purchased Sub–Zero and Thermador appliances.

der the Agreement, *inter alia,* Contractors was required to use its best efforts to promote and market these brands purchased from Clarke, and Clarke was required to use its best efforts to supply the products to Contractors on a timely basis. By letter dated April 14, 2000, Clarke gave Contractors notice that Clarke was terminating the Agreement on the basis that Contractors' violated its "best efforts" requirement, effective ninety days thereafter. Clarke refused to accept any new orders for products from Contractors after July 14, 2000. Contractors' then filed this action.[4]

Clarke argues in this motion that a forum selection clause in the Agreement requires that this action be brought in Massachusetts.

## II. Summary Judgment Standard

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. Rule 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact...." *Miner v. Glens Falls,* 999 F.2d 655, 661 (2d Cir.1993) (citation omitted). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505), *cert. denied,* 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). If the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The Court resolves "all ambiguities and draw[s] all inferences in favor of the non-moving party in order to determine how a reasonable jury would decide." *Aldrich,* 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). *See also Suburban Propane v. Proctor Gas, Inc.,* 953 F.2d 780, 788 (2d Cir.1992). Additionally "[w]here, as here, the non-movant bears the burden of proof at trial, the movant can satisfy its burden of production by pointing out an absence of evidence to support an essential element of the non-movant's case." *Ginsberg v. Healey Car & Truck Leasing, Inc.,* 189 F.3d 268, 270 (2d Cir.1999) (citing *Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548 and *Tops Mkts., Inc. v. Quality Mkts., Inc.,* 142 F.3d 90, 95 (2d Cir.1998)).

## III. Discussion

Clarke maintains that the instant action cannot be pursued in this Court because the forum selection clause in the Agreement provides that any action to enforce the Agreement must be brought in Massachusetts. Contractors argues, however, that the parties' relationship constitutes a "franchise" under Connecticut law and thus the forum selection clause is invalidated by the Connecticut Franchise Act's mandate that "any waiver of the rights of a

---

4. Clarke removed this action from the Connecticut Superior Court, Judicial District of Hartford on August 25, 2000. The parties do not dispute the existence of diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).

franchisee under Sections 42–133f or 42–133g which is contained in any franchise agreement entered into or amended on or after June 12, 1975, shall be void." Conn. Gen.Stat. § 49–133(f); *see also* Conn.Gen. Stat. § 49–133g(a) (providing that "any franchisee may bring an action for violation of Sections 42–133e to 42–133g inclusive, in the superior court to recover damages sustained by reason of such violation . . ."). Clarke responds that there are no genuine issues of material fact that the relationship between the parties was not that of franchisee and franchisor and thus, the forum selection clause controls. In the alternative, Clarke asserts that, even assuming their relationship was that of franchisee and franchisor and the action is properly here, there are no genuine issues of material fact that Clarke had "good cause" to terminate its relationship with Contractors.

The first step in the analysis is to determine whether there was a franchise relationship between Clarke and Contractors as a result of the Agreement.

## A. "Franchise" Under Connecticut Law

 Connecticut General Statute § 42–133e(b) defines "franchise" as an oral or written agreement or arrangement in which:

> (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor, . . . and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate . . . .

Conn.Gen.Stat. § 42–133e(b). Here, the parties expressly disavowed the existence of a franchise relationship in the Agreement. *See* Agreement § 1.2 ("Dealer agrees that it is an independent contractor, not an agent, employee or franchise of the Distributor . . . ."). However, the label given to the relationship by the parties, while relevant, is not determinative of the existence of a franchise relationship. *See Hartford Elec. Supply Co. v. Allen–Bradley Co., Inc.,* 250 Conn. 334, 736 A.2d 824, 833 (1999); *Petereit v. S.B. Thomas, Inc.,* 853 F.Supp. 55, 60 (D.Conn.1993) (stating that the existence of a franchise relationship "is fixed by reality, not by what defendant[s] or plaintiffs call it, though descriptive language may be relevant") *aff'd. in part, rev'd in part,* 63 F.3d 1169 (2d Cir. 1995), *cert. denied,* 517 U.S. 1119, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1996). Overall, a franchise relationship is exemplified by a certain "level of control" of the franchisee's operation by the franchisor. *See Hartford Elec. Supply Co.,* 736 A.2d at 833.

While there is no precise formula as to what meets the first part of the test for determining a franchise relationship under § 42–133e of a "marketing plan or system prescribed in substantial part by a franchisor," *see id.* at 834; *Chem–Tek, Inc. v. General Motors Corp.,* 816 F.Supp. 123, 129 (D.Conn.1993); *Sorisio v. Lenox, Inc.,* 701 F.Supp. 950, 960 (D.Conn.1988), *aff'd,* 863 F.2d 195 (2d Cir.1988), the Connecticut Supreme Court and U.S. District Court in Connecticut have generally applied the factors outlined in *Consumers Petroleum of Connecticut, Inc. v. Duhan,* 38 Conn.Supp. 495, 452 A.2d 123 (1982), to determine this issue. *See Hartford Elec. Supply Co.,* 736 A.2d at 834; *Ackley v. Gulf Oil Corp.,* 726 F.Supp. 353, 365 (D.Conn.1989); *Aurigemma v. Arco Petroleum Prods. Co,* 698 F.Supp. 1035, 1038–39 (D.Conn.1988); *McKeown Distributors Inc. v. Gyp–Crete Corp.,* 618 F.Supp. 632, 642 (D.Conn.1985).

Those factors include the level of control the putative franchisor had over the putative franchisee's: "(1) hours and days of operation; (2) advertising; (3) lighting; (4) employee uniforms; (5) prices; (6) trading stamps; (7) hiring; (8) sales quotas; and (9) management training." *Hartford Elec. Supply Co.*, 736 A.2d at 834 (citing *Petroleum*, 452 A.2d at 125). Courts have also looked at whether the franchisor provided the franchisee with financial support, audited its books, or inspected its premises. *See id.*

As to the second prong of Conn.Gen. Stat. 42–133e, requiring that the operation of the franchisee's business be "substantially associated with the franchisor's trademark ... or other commercial symbol," the Connecticut Supreme Court has held that, while the statute does not require that a putative franchisee carry exclusively franchisor-trademarked products, a showing of a "dependen[ce] on the public's confidence in the franchised product for most or all of [the franchisee's] business" is required. *Hartford Elec. Supply Co.*, 736 A.2d at 837–38, 839 & n. 25 (citing *Grand Light & Supply Co., Inc. v. Honeywell, Inc.*, 771 F.2d 672, 677 (2d Cir.1985)); *see also Hydro Air of Connecticut, Inc. v. Versa Technologies, Inc.*, 599 F.Supp. 1119, 1125 (D.Conn.1984); *Sorisio*, 701 F.Supp. at 961. The Connecticut Supreme Court has defined "substantial" as it is used in the Connecticut Franchise Act to mean "essentially; without material qualification; in the main .... of real worth and importance; of considerable value; valuable. Belonging to substance; actually existing; real; not seeming or imaginary; not illusive; solid; true; veritable.... Synonymous with material." *Hartford Elec. Supply Co.*, 736 A.2d at 838. More specifically, in *Muha v. United Oil Co.*, 180 Conn. 720, 433 A.2d 1009 (1980), the Connecticut Supreme Court held that a gasoline service station operator could not establish "substantial associa-

tion" because the wholesaler—United Oil—owned no trademark, the station sold only gasoline, oil, and a few battery products containing the trademark of United Oil's supplier, "CITGO," most of the operator's profit was derived from its repair business, not sales of gasoline, oil, or battery products, United Oil was only allowed to use the CITGO trademark for limited purposes, and, other than gasoline and oil, the operator was free to sell products other than those supplied by United Oil. In *Sorisio*, this Court held that no "substantial association" with the putative franchisor's trademark existed where the putative franchisor's merchandise constituted less than ten percent of putative franchisee's total purchases of products for sale in his store. *See Sorisio*, 701 F.Supp. at 961–62. This Court has also held that no "substantial association" existed where the sales of a putative franchisor's products constituted approximately forty-one percent of the putative franchisee's business and the gross profit attributable to sales of putative franchisor's products was approximately forty percent. *See Rudel Machinery Co. Inc., v. Giddings & Lewis, Inc.*, 68 F.Supp.2d 118, 124–28 (D.Conn.1999).

### B. Existence of a "Franchise" in the Instant Case

Based on an examination of the evidence presented, the Court concludes that, even accepting as true all of Contractors' evidence regarding its relationship with Clarke, Contractors has failed to present a genuine issue of material fact that the operation of Contractors' business was "substantially associated" with Clarke's trademark, trade name, or other commercial symbol. *See* Conn.Gen.Stat. § 42–133e(b).

First, while Contractors argues that it held itself out and marketed its business under the Sub–Zero and Thermador

trademarks, this does indicate that its business was "substantially associated" with *Clarke's* trademark or other commercial symbol. *See Muha*, 433 A.2d at 1011 (holding that marketing under "CIT-GO" trademark was not equated with marketing under United Oil trademark). Contractors has presented no evidence that its business involved the use of Clarke's trademark or other commercial symbol for any purpose. The instant case can be distinguished on that basis from those where a showing of "substantial association" was found. For example, in *Hartford Electric Supply Company*, the Connecticut Supreme Court found a "substantial association" with the franchisor's name, logo, and trademark where "(1) the plaintiff distributes the defendant's catalogues and promotional materials containing the defendant's logo; (2) the flyers used by the plaintiff contain the defendant's logo; and (3) the plaintiff prominently displays a sign containing the defendant's name on the plaintiff's premises." *Hartford Elec. Supply Co.*, 736 A.2d at 838. Similarly, in *Carlos v. Philips Business Systems, Inc.*, 556 F.Supp. 769, 776 (E.D.N.Y.1983) (applying Connecticut law), the court found a franchise relationship where the franchisee had a license to use the franchisor's trademark, made extensive use of the franchisor's trademark, was encouraged to associate his business with the franchisor's name, answered his phone using the franchisor's name, and featured the franchisor's name on the franchisee's business stationery and entrance to its place of business. Also, in *Chem–Tek*, this Court found a "substantial association" where Chem–Tek used GM trademarks and logotypes on letterhead and business cards, and GM trademark products represented a substantial part of Chem–Tek's business. *Chem–Tek*, 816 F.Supp. at 129 ("[GM's] trademarks impliedly guaranty [sic] the quality of the products"). Contractors

has provided no evidence that it sold any "Clarke brand" products, used the Clarke name as part of its own trade name, or featured the Clarke name on its letterhead or business cards. As well, while Contractors did feature the names "Sub–Zero" and "Thermador" on its sign and in window stickers, it did not use any Clarke-supplied product name as part of its own trade name, nor did it feature any Clarke-supplied product name on its letterhead or business cards. Moreover, the Sub–Zero and Thermador names and trade dress on Contractor's sign and window stickers appeared alongside brand names and trade dress of appliances not distributed by Clarke.

Second, Contractors has not presented any evidence to dispute Clarke's evidence that "Clarke-supplied" products generally accounted for less than half of Contractors' overall sales. *See* Raftus Aff. at ¶ 7. Indeed, Contractor's evidence indicates that, in fiscal year 1999, sales of Sub–Zero and Thermador products amounted to 13.8 percent of Contractor's gross profit. Rotman Dep. at 24. In addition to the products supplied by Clarke, Contractors also purchased and sold General Electric, Hotpoint, Amana, Whirlpool, and Maytag appliances. Contractors has not presented evidence indicating that its sales of Sub–Zero, Dynasty, and Thermador products exceeded its sales of these other products. *See Muha*, 433 A.2d at 1011–12; *Grand Light*, 771 F.2d at 677 (finding no substantial association with putative franchisor's trademark where only small percentage of putative franchisee's business related to distribution relationship between the parties); *Rudel Machinery Co. Inc. v. Giddings & Lewis, Inc.*, 68 F.Supp.2d 118, 124–28 (D.Conn. 1999) (no "substantial association" where sales of a putative franchisor's products constituted approximately forty-one percent of putative franchisee's business and

the gross profit attributable to sales of putative franchisor's products was approximately forty percent); *James v. Whirlpool Corp.*, 806 F.Supp. 835, 842 (E.D.Mo. 1992) (applying similar Michigan Franchise Act) (finding no "substantial association" with putative franchisor's trademark, where putative franchisee distributed variety of parts not bearing the putative franchisor's trademark). As noted earlier, while the Connecticut Franchise Act does not require that a putative franchisee carry exclusively franchisor-trademarked products, a showing that the putative franchisor's products account "for most or all of [the franchisee's] business" is required, and no such showing has been made here. *Hartford Elec. Supply Co.*, 736 A.2d at 837–38, 839 & n. 25.

Third, Contractors has presented no evidence to show that its customers considered business with Contractors as business with Clarke. *Contrast Hartford Elec. Supply Co.*, 736 A.2d at 838 ("For fifty years, the plaintiff widely has been recognized as the leading distributor of the defendant's products in Connecticut, causing customers in the trade to think of the parties as 'one and the same' identity."). As noted by this Court in *Rudel Machinery*, "[r]equiring a plaintiff in a CFA case to demonstrate that most or all of its business is associated with the defendant comports with the statute's legislative history," which indicates that the Connecticut Franchise Act was intended to protect unsophisticated individuals whose economic survival depends on the franchise relationship. 68 F.Supp.2d at 126. The evidence presented by Contractors in this case neither indicates such an association, nor a relationship marked by a such a severe disparity in bargaining power or a reliance on one particular distributor.

In sum, Contractors has failed to present evidence that its business was substantially associated with the Clarke's trademark or other commercial symbol[5]. Accordingly, no reasonable trier of fact could conclude that its relationship with Clarke was that of franchisee and franchisor as provided by the Connecticut Franchise Act, Conn.Gen.Stat. § 42–133e.

### C. Validity of Forum Clause

Contractors has presented no other evidence indicating that enforcement of the forum clause would be unreasonable or unjust under the circumstances or was obtained through fraud or overreaching. *See Jones v. Weibrecht*, 901 F.2d 17 (2d Cir. 1990) (applying this standard, originally set forth in M/S *Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), to determine whether to enforce a contractual forum selection clause). Accordingly, the Court declines to find the forum clause invalid or otherwise unenforceable.

### IV. Conclusion

For the foregoing reasons, the defendant's motion for summary judgment [Doc. # 5] is GRANTED, without prejudice to the plaintiff's filing this action in the proper forum.

---

**5.** Therefore, the Court need not address whether Contractors established the first prong of the test for a franchise relationship under the Connecticut Franchise Act, Conn. Gen.Stat. § 42–133e, or whether there was "good cause" for the termination.